Ronald BRADLEY et al.,
Plaintiffs,

v.

William G. MILLIKEN, Governor of the
State of Michigan and Ex-Officio Member
of Michigan State Board of Education, et al., Defendants.

Civ. No. 35257.

United States District Court,
E. D. Michigan, S. D.

Aug. 15, 1975.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., for plaintiffs.

George T. Roumell, Jr., Riley & Roumell, Theodore Sachs, Marston, Sachs, O'Connell, Nunn & Freid, Detroit, Mich., George L. McCargar, Jr., Asst. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION AND REMEDIAL DECREE

(Findings of Fact and Conclusions of Law)

DeMASCIO, District Judge.

## I. INTRODUCTION

Our task in this on-going litigation is to formulate a just, equitable and feasible plan to desegregate the Detroit School System, taking account of the practicalities at hand. We do so in response to a United States Supreme Court mandate that we formulate a "decree directed to eliminating the segregation found to exist in Detroit City Schools." Writing for the majority of the Supreme Court, Chief Justice Burger noted that the district court and court of appeals:

> "proceeded on an assumption that the Detroit schools could not be truly desegregated—in their view of what constituted desegregation—unless the racial composition of the student body of each school substantially reflected the racial composition of the population of the metropolitan area . . .." *Milliken v. Bradley*, 418 U.S. 717, 740, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974).

The Chief Justice then pointed out that *Swann v. Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) "does not require any particular racial balance in each 'school, grade or classroom.' . . ." 418 U.S. at 740–41, 94 S.Ct. at 3125. Thus, the Court did not deem it essential to furnish guidelines for desegregating the Detroit School System. Cf. *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Rather, it left this court to determine what constitutes desegregation in this particular school district.

In our analysis, we have been mindful that rigid and inflexible desegregation plans too often neglect to treat school children as individuals, instead treating them as pigmented pawns to be shuffled about and counted solely to achieve an abstraction called "racial mix." We recognize that our concern is with the very young and that a just, equitable and feasible desegregation plan should not destroy the educational mission of the schools they attend. We are aware of the adverse educational and psychological impact upon black children compelled to attend segregated schools; to separate them from other children solely because of skin pigmentation is

indeed invidious. But although the resulting injury is great, the remedy devised should not inflict sacrifices or penalties upon other innocent children as punishment for the constitutional violations exposed. We must bear in mind that since those committing the grotesque violations are no longer about, any such punishment or sacrifices would fall upon the very young; it is the children for whom the remedy is fashioned who must bear the additional burdens.

The necessity of preserving the educational system for whom this remedy is addressed has compelled us to scrutinize carefully plans that are rigidly structured to achieve a racial mix, that include pairing and clustering of schools, that fracture grade structures and that include massive transportation. All of these techniques require children to spend more time going to school and divert educational dollars and energy from legitimate educational concerns.

■■ If Detroit's school population were more equally divided between black and white or if the desegregation area were sufficiently large to permit greater equalization, it would be possible to diminish the inevitable limitations on the task of eliminating racially identifiable schools in the district. But it is impossible to avoid having a substantial number of all black or nearly all black schools in a school district that is over 70% black. The truth of this statement is best demonstrated by the desegregation plan offered by the plaintiffs in this litigation; while plaintiffs contend that their plan affords the greatest degree of desegregation, their plan leaves the majority of the schools in the district between 75% and 90% black. An appropriate desegregation plan must carefully balance the costs of desegregation techniques against the possible results to be achieved. Where the benefits to be gained are negligible, those techniques should be adopted sparingly.

■ Finally, an effective and feasible remedy must prevent resegregation at all costs. To ignore the possibility of reseg-

regation would risk further injury to Detroit school children, both black and white. In a school district that is only 26% white, a remedy that does not take account of the possibility of resegregation will be short-lived and useless if that percentage of whites further decreased. A realistic desegregation plan should recognize that abuses such as optional attendance zones, gerrymandered attendance zones, discriminatory assignments, the bussing of black children away from closer white schools and school construction that knowingly tends to have segregative effects are unlikely to recur in a school system that has a majority black board of education and a bi-racial administrative staff.

■ The guidelines adopted by this court consider the "practicalities of the situation", and at the same time make "every effort to achieve the greatest possible degree of actual desegregation . . . ." *Davis v. School Comm'rs of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). The "practicalities" that an appropriate remedy should consider encompass the legitimate concerns of the school system and the community at large. One legitimate concern deserving of weight is the undesirability of forced reassignment of students achieving only negligible desegregative results. Another of the practicalities is the shifting demography occurring naturally in the school district together with the persistent increase in black student enrollment. Still another of the practicalities to be taken into account is the racial population of the district, which is predominantly black by a wide margin. Further practicalities that must be considered by this court include the declining tax base of the City of Detroit, the depressed economy of the city, and the volatile atmosphere created by the highest rate of unemployment in the nation. Finally, the decree must consider the overriding community concern for the quality of educational services available in the school district. An effective and flexible remedy must contain safeguards that will enhance rather

than destroy the quality of the educational services provided in the City of Detroit.

## II. PRIOR PROCEEDINGS

The Detroit School Desegregation case has been in litigation for nearly five years. The plaintiffs filed this action on August 18, 1970, naming as defendants the Detroit Board of Education, its members and the Detroit Superintendent of Schools, together with the Governor, Attorney General, State Board of Education and the State Superintendent of Public Instruction for the State of Michigan. The complaint alleged *inter alia* that as a result of actions and inactions on the part of all the named defendants, the Detroit Public School System was racially segregated. The complaint further challenged the constitutionality of Act 48 of the Michigan Public Acts of 1970 insofar as that Act precluded implementation of the April 7, 1970, "plan" to desegregate the Detroit Public Schools. The plaintiffs further prayed for a preliminary injunction to restrain the enforcement of Act 48 together with an order requiring the Detroit Board of Education to implement the so-called April 7, 1970, desegregation plan.

The district court ruled that plaintiffs were not entitled to preliminary injunctive relief and declined to rule on the constitutionality of Act 48. At that time the district court granted a motion dismissing the action as to the Governor and the Attorney General. (Rulings dated September 3, 1970.) Upon appeal, the United States Court of Appeals for the Sixth Circuit sustained the district court's denial of plaintiffs' motion for a preliminary injunction but reversed the district court in part, holding that portions of Act 48 were unconstitutional and at the same time ordering that the Governor and the Attorney General remain as parties to the litigation. *Bradley v. Milliken*, 433 F.2d 897 (6th Cir. 1970). Although the defendant Detroit Board of Education would have implemented the so-called April 7 desegregation plan upon order of the court or otherwise, the district court did not order implementation of such "plan"; instead as an interim plan, it adopted a plan submitted by the Detroit Board known as the "Magnet Plan." (December 3, 1970, Ruling on School Plans.)

Following a trial on the liability issue, the district court found that the Detroit School District was segregated on the basis of race. The court found that certain conduct on the part of the defendant Detroit Board of Education and the defendant State of Michigan, through its various state officials, fostered segregation in the Detroit Public School System and violated the Fourteenth Amendment rights of Detroit school children. The district court also held that the state was vicariously liable for certain *de jure* acts of the defendant Detroit Board of Education. The district court specifically found that the state failed until 1971 to provide funds for the transportation of pupils within the Detroit School System regardless of their poverty or distance from the school to which they were assigned, although at the same time the state provided financial assistance for student transportation to many neighboring, mostly white suburban districts. The district court finally found that the state, through Act 48, acted to "impede, delay and minimize racial integration in Detroit schools." 338 F.Supp. 582 at 589.

The district court thereafter ordered the parties to submit plans to desegregate the Detroit Public Schools. Pursuant to this order the defendant Detroit Board of Education submitted two plans, referred to as Plan A and Plan C, that were restricted to the corporate limits of the City of Detroit. At the same time the plaintiffs filed a desegregation plan known as the "Foster Plan" and the State defendants filed a "Metropolitan School District Reorganization Plan." Following the hearings conducted on the Detroit-only plan, the district court concluded that the Detroit Board of Education Plans A and C were legally insufficient because they would not signifi-

cantly desegregate the school system: The court found that Plan A was an elaboration and extension of the Magnet Plan then in effect and further found that Plan C as submitted by the Detroit Board was merely a token desegregation effort. The district court also rejected the plan submitted by plaintiffs, specifically finding that plaintiffs' plan would entail a re-casting of the entire Detroit School System and would leave the majority of its schools 75 to 95% black, thus making the Detroit School System more identifiably black. The district court then concluded as a matter of law that "under the evidence in this case [it] is inescapable that relief of segregation in the public schools in the City of Detroit cannot be accomplished within the corporate geographical limits of the city." The Court of Appeals for the Sixth Circuit affirmed the district court's ruling on the issue of segregation and its Findings of Fact and Conclusions of Law on the Detroit-only plan. The court further affirmed in principle the propriety of a metropolitan remedy. Following a grant of *certiorari* to the Court of Appeals, the Supreme Court, on July 25, 1974, affirmed the district court's finding on the liability issue of segregation and did not disturb the court's finding that the Detroit Public Schools could not be adequately desegregated within the corporate limits of the city but reversed the court's approval of a metropolitan remedy, holding that a district court may not impose a multi-district remedy to correct a single school district's acts of *de jure* segregation.

On January 13, 1975, upon receipt of the Supreme Court mandate from the Court of Appeals, this court filed an order requiring the parties to file a current status report. This order precipitated the filing of numerous motions to dismiss by the intervening suburban defendants. Following a pre-trial conference on February 18, 1975, the defendant Detroit Board and the plaintiffs were ordered to submit desegregation plans for Detroit only, on or before April 1, 1975. The State defendants were

ordered to submit a critique of the Detroit Board plan by April 20, 1975. On April 16, 1975, the court granted the motions to dismiss filed by the intervening suburban defendants and simultaneously granted plaintiffs' motion to amend their complaint to include allegations of inter-district *de jure* violations.

The plan submitted by the Detroit Board contained many components that were vague or poorly documented. Costs for these components, including transportation, were excessive. The defendant Detroit Board sought to add 3,416 new employees, many at salaries well in excess of those paid to its more experienced and tenured teachers. Moreover, the plan failed to inform the court of the extent to which each of the components might presently exist in the school system. When these deficiencies became apparent, the court deemed it advisable to appoint three court experts and commissioned them as officers of the court to obtain much of the needed information. The court assigned its experts to obtain from the Detroit Board sufficient data to evaluate the components included in the plan. Because the constitutional sufficiency of the defendant Board's plan could be determined only by examining all of the alternatives, the court deemed it necessary to request its experts to explore additional possibilities to aid the court's evaluation of the transportation component. The hearings on both plans commenced on April 29, 1975.

We now detail the findings of fact in order to determine the amount of desegregation possible in this school district, giving due consideration to the practicalities at hand. We are reminded that, according to *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1954), this court is to be guided by equitable principles. Thus, its guidelines must be flexible and responsive to public and private needs.

## III. FINDINGS OF FACT

A. *The Detroit School System*

1. The Detroit School System, which is coterminous with the City of Detroit,

is governed by a Central Board of Education. In an attempt to decentralize this huge school system the Michigan legislature, pursuant to Act 48 of the Michigan Public Acts of 1970 (Mich. Comp.Laws 388.171 *et seq.*) divided the school system into eight geographic "regions". Each region is governed by a regional board of education whose primary responsibilities and relationship with the central Board of Education are outlined in Defendant Board of Education's Exhibit 4, "Guidelines for Decentralization". Each region has a five-member board elected by the citizens residing within its boundaries. The individual board member receiving the highest number of votes is designated chairman of the regional board.

The Central Board of Education consists of 13 members. Five of its members are elected from the City of Detroit at large and the remaining positions are occupied by the eight regional chairmen. The day-to-day administration of the entire school system is the responsibility of a General Superintendent of Schools, an Executive Deputy Superintendent, a Deputy Superintendent and an Assistant Superintendent, together with eight Regional Superintendents selected by the regional boards. The "Guidelines for Decentralization" indicate that there is much autonomy left with the regional boards. For example, the regional boards retain the authority to change attendance boundaries within their regions, transfer teachers from school to school within their regions, vary the educational curriculum in schools within their regions and hire the Regional Superintendents. Under the regional system the quality of education could vary not only among regions but also among schools within a region. Notwithstanding this decentralized system, the Central Board of Education remains responsible for governing the entire system and for overseeing the actions of the regional boards.

2. Both the Central Board and the central administrative staff under the supervision of the General Superintendent are bi-racial in character. Nine of the Central Board's thirteen members, including the Board President, are black; the other four members are white. At the beginning of this remedial hearing the General Superintendent was white and the Executive Deputy Superintendent was black; when these proceedings were completed the white General Superintendent had retired and had been replaced by one who is black. The bi-racial aspects of the school administration extend throughout the entire staff, down to the level of the department heads.

The racial composition of the school administration has changed dramatically since the inception of this lawsuit in 1970. At the conclusion of the trial on the liability aspects of this litigation in 1971, the Central Board was composed of ten white members and three black members and the greater part of the General Superintendent's staff was white. As a result of the decentralization brought about by the passage of Act 48, the black community has become more involved in and has experienced greater control over the Detroit School System.

3. Although the Supreme Court decision in this case was handed down in July of 1974, the Detroit Board of Education did not take steps to formulate a desegregation plan until ordered to do so by this court. In January of 1975, however, they created a desegregation office commissioned to formulate an acceptable plan. The Detroit Board's plan, submitted to this Court on April 1, 1975, was adopted by a 9–4 vote. The nine black members of the Board voted in favor of the desegregation plan while the four white members opposed the plan as presented. Although this vote was split along racial lines, the central Board of Education is nevertheless a cooperative Board and is willing to desegregate the Detroit school system. However, the plan as submitted does not enjoy unanimous acceptance among the members of the Detroit Board, the members of the administrative staff or the members of the desegregation office. It is apparent that under the regional system it is possible

that the degree of desegregation under the Board's plan could vary among different regions and it is likely that the plan as submitted by the Central Board of Education enjoys varying degrees of acceptance in different regions.

B. *Statistical and Demographic Data*

4. The most recent official racial-ethnic distribution count, taken on September 27, 1974, discloses that there are 257,396 students enrolled in the Detroit Public Schools. Of this number 71.5% are black and 26.4% are white, while 2.1% is comprised of other ethnic groups. In the Detroit School System's regular K-12 program 247,113 students are enrolled, of which 71.4% are black and 28.6% is comprised of white and other ethnic groups. In the elementary schools, grades K-6, 141,806 students are enrolled, of which 72.3% are black and 27.7% is comprised of white and other ethnic groups. In the junior high schools, grades 7-8, 39,600 students are enrolled of which 73.0% are black and 27.0% is comprised of white and other ethnic groups. In the senior high schools, grades 9-12, 65,707 students are enrolled, of which 68.6% are black and 31.4% is comprised of white and other ethnic groups. (See Defendant Board of Education's Exhibit 6, page 4.) The racial composition of each region as of September 27, 1974, is reflected in the table next attached:

ETHNIC COMPOSITION
BY REGION

| Region | Total Student Membership | Racial-Ethnic Distribution | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | American Indian | | Asian American | | Black American | | Spanish Surnamed | | White and Others | |
| | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 1 | 24907 | 70 | 0.3 | 68 | 0.3 | 22486 | 90.3 | 234 | 0.9 | 2049 | 8.2 |
| 2 | 36972 | 121 | 0.3 | 93 | 0.3 | 22278 | 60.3 | 3450 | 9.3 | 11030 | 29.8 |
| 3 | 33723 | 22 | 0.1 | 50 | 0.1 | 23876 | 70.8 | 220 | 0.7 | 9555 | 28.3 |
| 4 | 36820 | 40 | 0.1 | 181 | 0.5 | 20414 | 55.4 | 145 | 0.4 | 16040 | 43.6 |
| 5 | 31354 | 7 | 0.0 | 16 | 0.1 | 30325 | 96.7 | 17 | 0.1 | 989 | 3.1 |
| 6 | 30796 | 37 | 0.1 | 48 | 0.2 | 19442 | 63.1 | 130 | 0.4 | 11139 | 36.2 |
| 7 | 24605 | 16 | 0.1 | 140 | 0.6 | 11114 | 45.2 | 88 | 0.3 | 13247 | 53.8 |
| 8 | 29725 | 4 | 0.0 | 26 | 0.1 | 28300 | 95.2 | 66 | 0.2 | 1329 | 4.5 |
| City-Wide Schools | 8494 | 15 | 0.1 | 34 | 0.4 | 5883 | 69.3 | 107 | 1.3 | 2455 | 28.9 |
| Total District | 257396 | 332 | 0.1 | 656 | 0.3 | 184118 | 71.5 | 4457 | 1.7 | 67833 | 26.4 |

5. This court previously found that the population of the City of Detroit peaked in 1950 and since that year has been declining steadily at the rate of approximately 169,500 per decade. In 1950 Detroit's population constituted 61% of the total population of the standard metropolitan area; in 1970 it comprised but 36% of that figure. The black population in the City of Detroit has increased markedly from 1.4% of the city population in 1900 to 43.9% in 1970. 338 F.Supp. 582 at 585–86. The Detroit Board of Education's demographic expert testified, and we agree, that a current study of Detroit population trends indicates that as of 1975 the population of the City of Detroit is majority black.

6. On September 27, 1971 this court found that the decline in the percentage of white students in the Detroit Public School system during the period 1961–1970 was greater than the percentage decline of the overall white population in the city. At the same time the percentage of black enrollment in the Detroit school system increased at a greater rate than the overall general black population in the city during the same period. In the 1960–1961 school year there were

285,512 students in the Detroit school system, of which 130,765 (45.8%) were black. In the 1966–1967 school year there were 297,035 students in the system, of which 168,299 (56.7%) were black. In the 1970–1971 school year 289,743 students were enrolled, of which 184,194 (63.6%) were black. During the period between 1968 and 1970 the Detroit school system experienced a larger increase in the percentage of black students than any other major northern school district. The percentage increase in Detroit during that period was 4.7% as contrasted with a high of 3.2% in Boston and a low of 1.1% in Denver among other major northern school districts. (338 F.Supp. 582 at 586.) This court predicted in 1971 that, if present trends continued, the percentage of black students in the Detroit Public Schools would be 72% in the 1975–1976 school year, 80.7% in the 1980–1981 school year and, further, the system would be virtually 100% black by 1992. (338 F.Supp. at 585.) The record compiled during this remedial proceeding demonstrates that the predictions made by the District Court in 1971 were totally accurate, if not somewhat conservative.[1] During the past five years the black student enrollment has increased at an average of 2% per year, with a corresponding 2% decrease in the white student population during the same five-year period. At the elementary level the school system is presently 72.5% black and the trend toward a 2% annual increase has been positively identified.

7. There are presently 326 schools in the Detroit Public School System: 226 elementary schools, 56 junior high schools, 22 high schools and 22 specialized and primary schools. The system operates on a feeder plan, in which elementary students are assigned to specific junior and senior high schools. The geographic distribution of these schools, which are distributed throughout the city, reflects the Detroit School System's devotion to the neighborhood school concept.

The increasing black student enrollment in the Detroit Public Schools System, which is evident even in schools located at the city's boundaries, is demonstrated by the following tables reflecting significant increases in black student enrollment since 1969:

TABLE I

RACIAL DEMOGRAPHIC SHIFT 1969–1974
OF SELECTED SCHOOLS—DETROIT EASTSIDE

PERCENTAGE BLACK ENROLLMENT

| School | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|
| CARSTENS | 37.4 | 48.0 | 62.3 | 73.2 | 82.6 | 88.3 |
| GUYTON | 17.2 | 30.6 | 49.5 | 64.1 | 73.9 | 77.9 |
| HAMILTON | 63.6 | 70.8 | 71.8 | 74.2 | 79.8 | 83.4 |
| HOSMER | 8.2 | 18.1 | 28.2 | 44.8 | 57.8 | 70.0 |
| IVES | 6.2 | 13.0 | 19.1 | 37.9 | 54.0 | 64.2 |
| LINGEMANN | 53.1 | 60.2 | 62.6 | 65.8 | 68.9 | 72.3 |
| JACKSON J. H. | 39.8 | 43.3 | 54.2 | 71.9 | 85.1 | 92.0 |
| ROBINSON M. S. | — | — | 69.1 | 84.8 | 88.7 | 92.6 |

1. The District Court in 1971 predicted that in the 1975–1976 school year the black student enrollment would total 72 percent. The evidence taken during this remedial proceeding indicates that that figure was low. Black enrollment in the elementary schools exceeded 72% on September 27, 1974, and black enrollment system-wide on that date was 71.5%.

## TABLE II

RACIAL DEMOGRAPHIC SHIFT 1969–1974
OF SELECTED SCHOOLS—NORTHEAST DETROIT

PERCENTAGE BLACK ENROLLMENT

| | Year | | | | | |
|---|---|---|---|---|---|---|
| School | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| COOPER | 59.0 | 72.1 | 79.6 | 85.7 | 86.9 | 90.3 |
| A. L. HOLMES | 86.6 | 93.2 | 95.3 | 96.3 | 97.8 | 98.5 |
| CLEVELAND J. H. | 68.8 | 71.6 | 74.9 | 74.3 | 75.9 | 79.4 |
| GREUSEL J. H. | 69.5 | 73.6 | 75.9 | 78.5 | 82.2 | 81.4 |

## TABLE III

RACIAL DEMOGRAPHIC SHIFT 1969–1974
ALONG WOODWARD AVENUE *

PERCENTAGE BLACK ENROLLMENT

| | Year | | | | | |
|---|---|---|---|---|---|---|
| School | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| HAMPTON | 68.8 | 75.1 | 60.7 | 70.6 | 75.3 | 81.5 |

* Woodward Avenue is a major thoroughfare in Detroit, which divides the city
along east-west lines.

## TABLE IV

RACIAL DEMOGRAPHIC SHIFT 1969–1974
OF SELECTED SCHOOLS ON DETROIT'S NORTH SIDE
(BORDERING EIGHT MILE ROAD)

PERCENTAGE BLACK ENROLLMENT

| | Year | | | | | |
|---|---|---|---|---|---|---|
| School | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| BOW | 13.6 | 17.8 | 27.9 | 44.7 | 57.4 | 68.6 |
| GREENFIELD PK. | 32.3 | 38.2 | 41.1 | 46.2 | 50.7 | 54.0 |
| MARSHALL | 57.3 | 65.0 | 69.3 | 75.1 | 81.7 | 84.6 |
| MASON | 48.6 | 52.7 | 61.6 | 69.7 | 77.2 | 83.5 |
| WINSHIP | 50.1 | 70.4 | 89.8 | 93.3 | 96.2 | 97.7 |
| CLEVELAND J. H. | 68.8 | 71.6 | 74.9 | 74.3 | 75.9 | 79.4 |
| FARWELL J. H. | 63.3 | 67.8 | 68.4 | 68.0 | 73.9 | 82.4 |
| GRANT J. H. * | 21.7 * | 26.2 * | 27.8 * | 29.7 * | 38.1 * | 41.4 * |
| HAMPTON J. H. | 68.8 * | 75.1 * | 95.5 | 97.1 | 98.1 | 98.8 |
| PERSHING H. S. | 57.7 | 63.8 | 73.1 | 81.0 | 83.4 | 85.6 |

* Elementary School Figures.

## TABLE V

### RACIAL DEMOGRAPHIC SHIFT 1969–1974
### OF SELECTED SCHOOLS IN NORTHWEST–WEST AREA
### OF DETROIT

#### PERCENTAGE BLACK ENROLLMENT

| School | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| BURNS | 31.4 | 59.8 | 80.0 | 90.0 | 94.5 | 97.1 |
| CADILLAC | 17.6 | 39.1 | 73.5 | 75.3 | 90.9 | 94.4 |
| CRARY | 4.5 | 20.6 | 40.9 | 61.9 | 83.0 | 89.1 |
| DOSSIN | 6.0 | 5.0 | 16.8 | 34.2 | 64.0 | 80.8 |
| FORD | 34.2 | 35.4 | 51.8 | 70.0 | 84.3 | 89.6 |
| HERMAN | 55.6 | 58.5 | 66.4 | 73.9 | 79.3 | 85.8 |
| McFARLANE | 77.6 | 82.0 | 89.9 | 93.9 | 95.7 | 96.5 |
| NEWTON | 14.5 | 21.8 | 27.8 | 45.1 | 66.9 | 76.9 |
| PARKER | 62.7 | 79.4 | 88.1 | 95.1 | 97.0 | 97.6 |
| PARKMAN | 7.8 | 12.8 | 29.9 | 47.8 | 68.4 | 78.3 |
| COOLEY H. S. | 58.9 | 76.3 | 94.0 | 97.4 | 99.3 | 99.6 |

## TABLE VI

### RACIAL DEMOGRAPHIC SHIFT 1969–1974
### OF SELECTED SCHOOLS IN DETROIT'S SOUTHWEST AREA

#### PERCENTAGE BLACK ENROLLMENT

| School | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| CRAFT | 88.4 | 86.8 | 84.3 | 92.1 | 91.7 | 91.3 |
| ELLIS | 66.9 | 71.6 | 74.0 | 72.5 | 77.0 | 83.8 |
| OWEN | 69.5 | 70.8 | 68.7 | 67.4 | 71.5 | 79.5 |

Shifting demographic patterns in Detroit are reflected not only in schools that are 70% or more black, but also in those schools that, though not yet majority black, will be so within a short period:

## TABLE VII

### RACIAL DEMOGRAPHIC SHIFTS 1969–1974
### IN SELECTED SCHOOLS ON DETROIT'S NORTHWEST
### AND WEST SIDES

| School | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| EMERSON | 3.6 | 3.6 | 3.0 | 8.5 | 27.7 | 40.9 |
| McKENNY | 5.1 | 5.7 | 10.3 | 22.2 | 38.4 | 46.4 |
| COOLIDGE | 1.3 | 2.1 | 5.1 | 13.8 | 30.1 | 45.6 |

## TABLE VIII

### RACIAL DEMOGRAPHIC SHIFTS 1969–1974
### IN SELECTED SCHOOLS IN NORTHEAST DETROIT

| School | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| GRANT | 21.7 | 26.2 | 27.8 | 29.7 | 38.1 | 41.4 |
| LYNCH | 10.4 | 6.7 | 12.8 | 18.0 | 30.9 | 47.8 |

Based on present trends, it is accurate to expect that the black enrollment of several schools on Detroit's northwest and east sides will be in excess of 70% black by the 1975–1976 school year:

## TABLE IX

### RACIAL DEMOGRAPHIC SHIFTS 1969–1974

### PERCENTAGE BLACK ENROLLMENT

| School | Year | | | | | |
|---|---|---|---|---|---|---|
| | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| BOW | 13.6 | 17.8 | 27.9 | 44.7 | 57.4 | 68.6 |
| COFFEY | — | 29.0 | 33.2 | 43.6 | 51.8 | 68.8 |
| EDISON | 0.3 | 2.7 | 9.3 | 25.3 | 49.5 | 65.3 |
| HOSMER | 8.2 | 18.1 | 28.2 | 44.8 | 59.8 | 70.0 |

The Ford High School, whose attendance zone abuts Detroit's border, is located on Detroit's extreme northwest side. As indicated by the following table, Ford, presently 55% black, will in all likelihood be 60% black by the 1975–1976 school year if demographic trends continue:

## TABLE X

### RACIAL DEMOGRAPHIC SHIFT 1969–1974 IN
### FORD HIGH SCHOOL

### PERCENTAGE BLACK ENROLLMENT

| Year | | | | | |
|---|---|---|---|---|---|
| 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
| 13.4 | 20.0 | 30.5 | 40.3 | 48.2 | 54.6 |

Based on current trends, the following schools, which have student population between 25% and 35% black, can expect to have substantial increases in black enrollment:

### TABLE XI

RACIAL DEMOGRAPHIC SHIFTS 1969–1974

PERCENTAGE BLACK ENROLLMENT

| School | Year 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|
| GOODALE | 0.1 | 0.7 | 1.5 | 4.0 | 14.9 | 25.2 |
| MACOMB | 1.6 | 2.8 | 4.9 | 8.1 | 21.0 | 30.6 |
| EMERSON J. H. | 3.6 * | 3.6 * | 3.0 * | 8.4 | 19.9 | 30.6 |
| MURPHY J. H. | 6.5 | 9.8 | 12.7 | 6.3 | 20.1 | 30.3 |
| TAFT J. H. | 0.3 | 0.7 | 2.4 | 12.8 | 21.0 | 34.5 |

* Elementary School Figures.

8. These tables clearly demonstrate the City of Detroit's changing demography and conclusively reflect significant increases in black student enrollment since 1969. The tables point out that schools that were as low as 4.5% black in 1969 had increased to as much as 89.1% black by 1974. The demographic patterns in Detroit reflect a large number of schools that are 70% or more black and it is apparent that many schools that are not yet majority black will become majority black within a short period of time. For example, Table VII above contains a sampling of schools located on the northwest side of Detroit that will experience a majority black school population within the coming school year. Similarly, schools located in the northeast section of Detroit that are presently 40–50% black will be majority black within the coming school year. If present demographic trends continue, schools that now have student enrollment ranging between 20 and 40% black can expect to have substantial increases in black enrollment. Although the Detroit school system as a whole is experiencing a 2% annual increase in black enrollment, the following table demonstrates that individual schools in many areas undergoing racial demographic shifts have experienced increases in black enrollment that are as high as 16.9%.

These shifting demographic patterns are rapidly changing Detroit's residential patterns; mixed residential areas may now be found in all parts of the city, including areas bordering the suburbs.

AVERAGE YEARLY PERCENTAGE RACIAL CHANGE IN SELECTED SCHOOLS BETWEEN 1969–1974

PERCENTAGE BLACK ENROLLMENT

| School | 1969 | 1974 | Average Yearly Percentage Change |
|---|---|---|---|
| Emerson | 3.6 | 30.6 | 5.4 |
| Marshall | 57.3 | 84.6 | 5.5 |
| Kennedy | 64.6 | 93.1 | 5.7 |
| Herman | 55.6 | 85.8 | 6.0 |
| Cooper | 59.0 | 90.3 | 6.3 |
| Van Zile | 46.9 | 79.7 | 6.6 |
| Parker | 62.7 | 97.6 | 7.0 |
| Mason | 48.6 | 83.5 | 7.0 |
| Lynch | 10.4 | 47.8 | 7.5 |
| McKenny | 5.1 | 46.4 | 8.3 |
| Coolidge | 1.3 | 45.6 | 8.9 |
| Cerveny | 51.5 | 97.5 | 9.2 |
| Winship | 50.1 | 97.7 | 9.5 |
| Carstens | 37.4 | 88.3 | 10.2 |
| Bow | 13.6 | 68.6 | 11.0 |
| Ford | 34.2 | 89.6 | 11.1 |
| Ives | 6.2 | 64.2 | 11.6 |
| Hosmer | 8.2 | 70.0 | 12.4 |
| Newton | 14.5 | 76.9 | 12.5 |
| Edison | 0.3 | 65.3 | 13.0 |
| Burns | 31.4 | 97.1 | 13.1 |
| Guyton | 17.2 | 77.9 | 12.1 |
| Parkman | 7.8 | 78.3 | 14.1 |
| Dossin | 6.0 | 80.8 | 15.0 |
| Cadillac | 17.6 | 94.4 | 15.4 |
| Crary | 4.5 | 89.1 | 16.9 |

9. The Board began to undertake steps to desegregate as early as 1970 and

was precluded from doing so only by the passage of Act 48 of the Michigan Public Acts of 1970 (Mich.Comp.Laws § 388.-171) by the Michigan Legislature. The Board has followed the policy of transporting students to relieve overcrowding in such a manner as to promote desegregation. In the 1974–1975 school year the Detroit Board was able to increase the percentage of black students in many schools that previously were nearly all-white. The table next annexed demonstrates the dramatic increases in black student enrollment at various schools accomplished by such transportation:

PERCENTAGE BLACK ENROLLMENT
IN SCHOOLS RECEIVING STUDENTS
TO RELIEVE OVERCROWDING

| School | 1974 Without Transportation | With Transportation |
|---|---|---|
| **Northwest Area** | | |
| Ann Arbor Trail * | 2 | 39 |
| Burgess | 4 | 21 |
| Carver * | 0 | 18 |
| Dow * | 32 | 43 |
| Harding | 18 | 22 |
| Healy * | 0 | 18 |
| Houghten * | 4 | 12 |
| Leslie | 0 | 32 |
| Lodge * | 0 | 27 |
| Mann | 14 | 25 |
| Weatherby | 3 | 16 |
| Yost * | 0 | 42 |
| **Northeast Area** | | |
| Burbank * | 0 | 16 |
| Hanstein * | 0 | 23 |
| Marquette * | 6 | 12 |
| McGregor * | 0 | 34 |
| Pulaski * | 2 | 14 |
| Robinson | 9 | 9 |
| Trix * | 0 | 24 |
| Wilkins | 6 | 16 |

\* Schools that abut the Detroit city limits.

C. *Plaintiffs' Plan*

10. The plaintiffs' desegregation plan, submitted on April 1, 1975 pursuant to an order of this court and revised on April 30, 1975, was designed by Dr. Gordon Foster, Director of the University of Miami Title IV Desegregation Center. The plan as devised by Dr. Foster deals solely with pupil reassignment. The rationale and the ultimate goal of the plan are that, as far as possible, every school within the district must reflect the racial ratio of the school district as a whole within the limits of 15 percentage points in either direction. Dr. Foster admitted that the 15% figure was arrived at arbitrarily. Under Dr. Foster's definition any school whose racial composition varies more than 15% in either direction from the Detroit system-wide ratio is racially identifiable. Accordingly, an elementary school with 57.3%–87.3% black enrollment, a junior high school with 58.0%–88.0% black enrollment and a senior high school with 51.9%–81.9% black enrollment are desegregated schools. Carrying Dr. Foster's plan a step further, an elementary school that is 56% black is a racially identifiable white school and an elementary school that is 85% black is a desegregated non-racially identifiable school. (Plaintiffs' plan, page 7A.)

11. In developing plaintiffs' plan, Dr. Foster testified he explored the extent to which desegregation could be effected by each of the following commonly accepted techniques: redrawing zone lines between contiguous zones of differing racial composition, pairing schools within these zones, pairing non-contiguous zones, changing feeder patterns in affected schools, examining various building utilization techniques, use of temporary space and changing grade structures in particular buildings. Dr. Foster examined these alternatives in an effort to achieve his desired racial mix. Thereafter, he subdivided the system into five clusters with similar racial compositions, each comprised of a group of high school constellations. (Plaintiffs' plan pages 3A, 4A.) Dr. Foster proceeded to alter the grade structures at particular schools within each cluster and schools within the clusters were then paired. The pairing of schools was accomplished by selection of all the "racially identifiable" white schools and the "racially identifiable" black schools in order of size and percentage of children by race. Thereafter, children in the newly created pairings were exchanged to achieve ratios conforming to Dr. Foster's definition of a desegregated school. The plan also created new feeder patterns for

junior and senior high schools that ultimately achieve a racial mix falling within the same parameters.

Plaintiffs' pupil reassignment plan does not include kindergarten and pre-kindergarten children; provision has been made for them to attend the school nearest their home, which in many instances necessitates changes in facility utilization. Under the plaintiffs' plan present high school juniors, although included in the pupil assignment process, are given the option of remaining at their present school and graduating there, assuming that to do so would not cause or maintain segregation. (Plaintiffs' plan page 5A.)

12. Under the plaintiffs' plan, not only are many students reassigned to elementary schools outside of their neighborhood for half of their elementary years but, as a result of the pairings and changes in feeder patterns into junior and senior high schools, many students will attend a school out of their home neighborhood for between eight and eleven years. See, e. g., plaintiffs' plan for Webster, Birney, Peck, Amos, Beard, Larned, Higginbotham, Glazier and Mc-Gregor schools. Under plaintiffs' plan only the racial ratio that could be achieved by a particular pairing was considered in the selection of schools for the pairings. Consequently, the plaintiffs' plan creates many problems relating to building capacity. For example, proposed enrollment exceeds school capacity at 18 junior high schools.[2] In addition, some elementary school pairings under the plan would result in over-enrollment. While plaintiffs' plan attempts to minimize problems of capacity by creating "swing grades" with the variable assignments of the 6th, 7th and 9th grades, this technique results in undue disruption of grade structures. At the senior high school level, the plaintiffs' plan has avoided problems of capacity by assuming a dropout correction factor of .7069 for blacks and .9426 for whites and others. (Plaintiffs' plan, page 6A.)

As a result, there would be 13,865 fewer blacks and 1,145 fewer whites in the three senior high grades than in the three junior high grades. However, no evidence was presented that justifies reliance upon such a dropout factor; consequently, capacity problems may be created by plaintiffs' plan at the senior high school level as well. Reliance upon a 30% dropout rate for black students at the senior high school level would disrupt .the entire school system if the projected number of dropouts did not materialize. Moreover, even if such a statistic were supported by credible evidence, plaintiffs have not allowed for the possibility that the dropout rate would decline in a desegregated system.

13. We find that a large number of schools are paired solely to achieve a desired racial ratio in each of the paired schools. (Tr. Vol. 18, p. 45.) The arbitrary pairings devised in plaintiffs' plan necessitate the transportation of thousands of black school children many miles to schools that still remain 80% or more black. The following table demonstrates that various schools were included in plaintiffs' plan despite the fact that only insignificant changes occurred in their racial composition:

| Plan Page | SCHOOL | 1974 | PROPOSED |
|---|---|---|---|
| 1 | McCulloch | 99.7 | 89.8 |
| 14 | Ilene | 99.5 | 89.2 |
| 14 | King | 99.2 | 88.9 |
| 29 | Duffield | 99.2 | 88.4 |
| 8 | Columbian | 99.6 | 88.2 |
| 8 | Columbian Primary | 100.0 | 87.3 |
| 27 | Bell | 99.7 | 87.3 |
| 25 | Marxhausen Primary | 98.8 | 86.8 |
| 12 | Ruthruff | 99.2 | 86.5 |
| 5 | Angel Primary | 98.8 | 86.4 |
| 1 | Joffe Primary | 100.0 | 86.3 |
| 2 | Sampson | 99.7 | 86.1 |
| 27 | Berry | 99.8 | 85.8 |
| 13 | Guest Primary | 97.5 | 85.7 |
| 11 | Noble | 98.8 | 85.5 |
| 12 | Herman | 85.8 | 85.4 |
| 25 | Campbell | 100.0 | 85.3 |
| 30 | Bunche | 100.0 | 85.0 |
| 11 | Sherrill | 99.9 | 84.7 |
| 9 | Parker | 97.6 | 84.6 |
| 11 | Courtis | 99.6 | 84.6 |
| 24 | Marshall | 84.6 | 84.4 |
| 11 | Barton | 100.0 | 84.2 |
| 32 | Tendler | 95.3 | 83.6 |
| 30 | Lingemann | 72.3 | 83.4 |

2. In addition, under plaintiffs' plan, the Columbus Junior High School would be over

capacity were it not for the utilization of temporary spaces.

| Plan Page | SCHOOL | 1974 | PROPOSED |
|---|---|---|---|
| 8 | Ellis | 83.8 | 83.0 |
| 15 | Higginbotham | 100.0 | 82.7 |
| 27 | Keith Primary | 99.6 | 82.6 |
| 30 | Bellevue | 96.7 | 82.1 |
| 28 | Krolik | 100.0 | 81.8 |
| 12 | Alger | 100.0 | 81.6 |
| 11 | McFarlane | 96.5 | 81.4 |
| 13 | Cadillac | 94.4 | 81.0 |
| 1 | Woodward | 99.9 | 81.0 |
| 4 | Chaney | 98.3 | 80.7 |
| 1 | Roosevelt | 99.9 | 80.7 |
| 9 | Monnier | 97.0 | 80.4 |
| 4 | Goldberg | 98.9 | 80.4 |
| 14 | Dossin | 80.8 | 80.8 |
| 2 | Turner | 99.4 | 80.1 |
| 4 | Owen | 79.5 | 80.0 |

| Plan Page | SCHOOL | % Black |
|---|---|---|
| 5 | Amos | 50.7 |
| 10 | Carver | 52.0 |
| 21 | Richard | 52.4 |
| 16 | Cooke | 52.5 |
| 13 | Houghton | 53.4 |
| 6 | Higgins | 54.1 |
| 7 | Cary | 54.1 |
| 22 | Trix | 54.9 |
| 31 | Burbank | 55.1 |
| 31 | McGregor | 55.4 |
| 6 | Bennett | 55.8 |
| 1 | Webster | 56.1 |
| 17 | Larned | 56.1 |
| 19 | Burt | 57.1 |
| 13 | Yost | 57.4 |
| 23 | Grayling | 57.4 |
| 6 | Harms | 57.6 |
| 20 | Law | 58.1 |
| 10 | McColl | 58.5 |
| 10 | Maybee | 58.5 |
| 23 | Greenfield Union | 58.6 |
| 9 | Everett | 58.6 |
| 23 | White | 56.3 |
| 27 | Clark | 59.0 |
| 3 | Burton | 59.4 |
| 19 | Holcomb | 59.4 |
| 22 | Fleming | 59.5 |
| 13 | Edison | 59.9 |
| 3 | Beard | 60.0 |

It is apparent that, for example, plaintiffs' selection of the Lingemann School was made solely because white students were needed for transfer to the Bunche School to accomplish plaintiffs' desired balance. Presently, the Lingemann School is 72.3% black and thus is a desegregated school by plaintiffs' definition. After application of plaintiffs' plan Lingemann School becomes 83.4% black. Lingemann was included in plaintiffs' plan irrespective of the fact that it is located in a naturally integrated neighborhood that has attained a measure of racial stability. The plaintiffs' plan groups the Craft, Ellis, Glazier and McKinstry Schools and transports 753 students; as a result, the Ellis School is reduced from 83.8% to 83.0% black. In the Carrie, Morley and Peck School grouping, the Carrie School is presently 58% black and thus not racially identifiable according to plaintiffs' definition. After transporting children, Carrie is reduced to 54.1% black; black students are bussed out of Carrie solely to be added to the black population at Morley.

In addition, after transporting thousands of students, there are a number of schools that are under or barely exceed the acceptable minimum percentage of black enrollment set by Dr. Foster. The following table demonstrates the racial mix achieved at selected schools:

Groupings of schools with comparable racial ratios remain even after the application of Plaintiffs' plan. Schools containing enrollment over 80% black are grouped in a contiguous area and follow a consistent pattern. Similarly, schools with enrollment under 60% black are grouped in contiguous areas and follow an easily discernible pattern. (See Defendant Board of Education's Exhibit 10.)

14. The plaintiffs' reassignment plan requires the transportation of 77,303 children, of which 48,312 are elementary school children and 28,991 are junior high school children.. Deducting 5,954 children presently being transported, plaintiffs have arrived at a total of 71,349 students requiring transportation under their plan as proposed.[3] Thereafter, plaintiffs use a factor of four daily round trips per bus with 66 pupils per bus and estimate that 271 additional busses would be required to effectuate their reassignment plan. (Plaintiffs' plan p. 7A.) There is no credible evi-

3. We have arrived at varying estimates that range 77,000 and 81,000 students requiring transportation under plaintiffs' plan.

dence to support plaintiffs' assumption that every bus could be utilized to make four round trip runs. The plaintiffs' estimate of 271 buses is further dependent upon the unrealistic assumption of utilizing one pick-up point for 66 school children without consideration of the distances students would have to walk to arrive at the pick-up point. Moreover, their estimate does not consider the ethnic composition of any area surrounding a pick-up point.

Plaintiffs' present estimate of 77,303 students is not far below their 1972 estimate of 82,000 children requiring transportation. The most credible estimate of the number of buses required for plaintiffs' 1972 plan was 900. Expert testimony given in 1972 estimated that a school district could transport an average of 100 students for each bus in service. (Witness Kuthy, Tr. pages 122–124, book 2; March 15, 1972.) Based upon this testimony, which was not challenged by plaintiffs, plaintiffs' plan would require the procurement of approximately 840 buses, including sufficient spares.

Accordingly, we find that the plaintiffs' plan involves the transportation of thousands of students, the great majority of whom would be transported from one predominantly black school to another predominantly black school, involves bus runs within the city of Detroit of up to thirty-eight minutes without taking account of time for loading and unloading and would result in many children spending between nine and eleven years in schools as far as five to twelve miles from their neighborhood.

15. The plaintiffs' plan, based upon a definition of racial identifiability as beyond a range of 15% from the system-wide racial mix, is rigidly structured. The plan does not consider the past or present demography of the Detroit school district, more particularly ignoring population shifts that have been occurring over the past decade. Moreover, the plan does not consider the possibility of resegregation in the City of Detroit.

Although Dr. Foster testified that his plan purports to avoid the possibility of resegregation, this testimony is premised upon the assumption that after application of the plan there would be "no pockets where people can go." (Tr.Vol. 19, page 166.) There is no credible evidence in this record to justify the assumption that adoption of plaintiffs' plan would lessen the chance of resegregation within or without the city; Dr. Foster's testimony fails to take account of the developed suburban areas that circumscribe the city. Accordingly we find that the plaintiffs' plan does not include provisions for promoting racial stability and avoiding resegregation. We re-affirm the prior finding of this court that:

"It would be a natural, forseeable and probable consequence of the implementation of the Plaintiffs' plan that the trend of the Detroit schools towards a higher percentage of black students and a lower percentage of white students will be sharply accelerated." (Tr. March 14, 1972, pages 584–586.)

D. *Detroit Board of Education Plan*

16. The Detroit Board of Education submitted a plan that provided for transportation of approximately 51,000 students. Interwoven into the Board's plan is the provision for magnet schools at both the middle school and senior high school levels to aid in attaining maximum desegregation. The goals of the Board's plan include establishing maximum effective desegregation, removing racially identifiable white schools and promoting interracial understanding and respect in a diversified school district. The Detroit Board plan takes into consideration the demography of the Detroit School District and recognizes that the Detroit School System is now 71.5% black system-wide (72.3% black at the elementary school level). The Board plan acknowledges that since 1969, the school district population has declined from 293,859 to 257,396, which represents a loss of 36,463 students or a 12%

decline. During this five-year period, the black school population has increased by 3500 students and over 40,000 white students have left the system. Accordingly, only 67,833 white students are presently enrolled in the Detroit School System as compared with 189,563 black students.

Under the Board plan, the Detroit School System continues to operate on a feeder pattern. The pairings have been devised to provide that every child will spend at least a portion of his education in either a neighborhood elementary school or a neighborhood junior and senior high school. Although regional lines are crossed in a few instances the plan generally respects regional boundary lines, which were brought about by the State's attempt to decentralize the school system.

17. Like the plaintiffs' plan, the Board plan explores each of the commonly accepted techniques for desegregation. Like the plaintiffs' plan, the Board plan revamps grade structures at the elementary level by providing that some will accommodate K through 3 and others K plus 4 through 6 and thereafter pairs various schools, providing transportation between the schools so paired. Through this process of pairing and clustering schools, the Board plan attempts to eliminate racially identifiable white elementary schools in Regions 2, 3, 4, 6 and 7. The reassignment plan desegregates the junior and senior high schools by changing the feeder patterns into the junior and senior high schools, but at the same time the plan attempts to respect the concept of high school constellations made up of neighborhood elementary schools and neighborhood junior high schools feeding into an area high school. Under the feeder plan realignment the senior high schools will be desegregated by September, 1976.

Eight senior high schools will remain unaffected by the plan.

The Board plan attempts to achieve a 40%–60% black racial mix in the presently white identifiable schools. Although the Board purports not to strive for fixed racial quotas, we find that it in fact does so. In developing its plan the Board sought to determine the racial ratio that provided maximum desegregation while preserving racial stability. The Board concluded that a racial mixture between 40% and 60% black provided a healthy and stable racial mix. The Board's statistical data demonstrates that where elementary schools in a high school constellation range from 75% to 95% black, the high school generally is 95% to 100% black: White students simply leave the system by the time they reach high school. Similarly, the statistical data establish that a racial mixture that does not exceed 60% black provides a degree of stability. Some of the pairings selected by the Board plan, particularly in Region 2, fall below the goal set by the Board only because of the high percentage of Spanish-speaking students in these schools, which ranges as high as 20% in some instances. To accommodate this factor the Board permitted the percentage of black students to fall below their target for racial mix.

18. The Detroit Board's pupil reassignment plan does not affect the schools in Regions 1, 5 and 8; each of these three regions will remain over 90% black. The basic premise of the defendant Board's plan is to eliminate all of the schools with black enrollment below 25% and bring them to the level of 40–60% black. These schools are located largely on the outer fringes of the city. The plan leaves untouched 95 schools, most of which are between 95–100% black and are located within the inner city.[4] Under the defendant Board's plan many

---

4. In addition to the 95 schools untouched by the pupil reassignment portion of the Board's plan, 16 schools that are already desegregated according to the plaintiffs' def-

inition are untouched, 6 elementary schools are not paired but are included in desegregated feeder patterns and 6 schools are taken out of service.

schools will operate over capacity, while some schools in the inner city will have substantial capacity available. The Board decided to leave 95 schools untouched principally because the Board found it impractical to desegregate the student bodies of these schools "without undue hardship of long distance travel." The Board's plan acknowledges that there are too many black students in the system to provide all of them with a desegregated experience while at the same time maintaining stability.

19. The pupil transportation portion of the Detroit Board plan anticipates the daily transportation of approximately 51,000 children between paired schools. The evidence suggests the need for a fleet of busses ranging between 335 and 425 66-passenger vehicles. The defendant Board has suggested that each bus would make two or three runs per day. (Defendant Board's Exhibit 28.) However, as indicated above with respect to the plaintiffs' plan, credible evidence has not been presented by either party to aid the court in making an accurate determination of the number of busses needed to transport this vast number of children. The Detroit Board lacks the experience needed to manage a transportation fleet and does not have available the appropriate data needed to devise an efficient transportation system. This court found it necessary to instruct the Detroit Board to produce a sufficient data base to permit a computer print-out of a grid showing the exact racial composition of the student population in any particular area. Such data are necessary to develop an efficient transportation scheme. Moreover, when such data are available there will be no justification for transporting children into an area without consideration of the ethnic composition of that area.

Transportation under the defendant Board's plan involves much shorter distances than the plaintiffs' plan. School pairings were made to allow transportation routes along major thoroughfares.

20. In addition to reassigning pupils between paired schools the Detroit Board's plan includes a provision to continue certain magnet schools. Pursuant to an order of this court on December 3, 1970, each of the eight regions created a magnet school, relying upon voluntary attendance. Although these magnet schools did not reach the racial mix sought by either the plaintiffs or the defendant Board, they did serve to provide some degree of desegregation.

The Board plan also provides for the creation of four vocational high schools, specializing in medical science, transportation, construction and the commercial arts. These four vocational schools will operate under an enrollment controlled to simulate the system-wide racial composition. In addition, the Board's plan creates two technical high schools with enrollment open to students throughout the entire school system and creates city-wide high schools with specialized curricula. The enrollment of these schools will be controlled to conform to the system-wide racial ratio. The vocational, technical and city-wide schools are designed as magnet schools to attract students from throughout the school system as a means of further desegregating the school system.

The Board plan further suggests that four co-curricular programs be implemented on a city-wide basis in order to provide additional children with a desegregated school experience. These programs would include music education, art, physical education and athletics. (Board plan page 30.)

Finally, the Board plan suggests the creation of cultural junior high school consortia designed to provide students from substantially black majority schools with an opportunity to spend part of their academic week with white students from other schools in various cultural centers in the greater Detroit area. The Board proposes that these classes be held at the Art Institute, the Detroit Public Library, the Merrill Palmer Institute,

Wayne State University, Shaw College and Lewis Business School.

### E. *Educational Components*

21. In addition to the vocational and career education and the junior high consortium the plan submitted by the Detroit Board includes the following educational components:

 a. In-Service Training

 b. Guidance and Counselling

 c. School-Community Relations

 d. Parental Involvement

 e. Student Rights and Responsibilities

 f. Testing

 g. Accountability

 h. Curriculum Design

 i. Bilingual Education

 j. Multi-Ethnic Curriculum

 k. Co-curricular Activities

The plan as submitted by the Detroit Board does not distinguish between those components that are necessary to the successful implementation of a desegregation plan and those that are not. Moreover, the defendant Board's plan does not inform the court of the extent to which any of these components may currently be in effect in the Detroit public school system; nor did the Board, either through its plan or through expert witnesses, provide the court with information adequate to permit the court to evaluate the budgetary requests made for each of the components. Accordingly, the court found it necessary to obtain a report from Dr. Louis Monacel outlining the extent to which any or all of these components currently exist in the Detroit School System. (See "Comparison of Existing Personnel, Programs, and Activities with the Personnel, Programs and Activities Required in the Detroit Public Schools Desegregation Plan.") The court also found it necessary to seek an evaluation of each of these components from Dr. Michael Stolee, one of the plaintiffs' expert witnesses. Finally, the court found it necessary to obtain additional information from its court-appointed experts to permit a proper evaluation of each of the components proposed in the Board plan.

22. We find that the majority of the educational components included in the Detroit Board plan are essential for a school district undergoing desegregation. While it is true that the delivery of quality desegregated educational services is the obligation of the school board, nevertheless this court deems it essential to mandate educational components where they are needed to remedy effects of past segregation, to assure a successful desegregative effort and to minimize the possibility of resegregation. In a segregated setting many techniques deny equal protection to black students, such as discriminatory testing, discriminatory counseling and discriminatory application of student discipline. In a system undergoing desegregation, teachers will require orientation and training for desegregation. Parents need to be more closely involved with the school system and properly structured programs must be devised for improving the relationship between the school and the community. We agree with the State Defendants [5] that the following components deserve special emphasis: (1) In-Service Training; (2) Guidance and Counselling; (3) Student Rights and Responsibilities (see this court's order, June 13, 1975); (4) School-Community Relations-Liaison; (5) Parental Involvement; (6) Curriculum Design; (7) Multi-Ethnic Curriculum; and, (8) Co-curricular Activities. Additionally, we find that a testing program, vocational education and comprehensive reading programs are essential. We find that a comprehensive reading instruction program together with appropriate remedial reading classes are essential to a successful desegregative effort. Intensified reading instruction is

---

5. See State Critique of Detroit Board's Desegregation Plan, page 39.

basic to an educational system's obligation to every child in the school community (Tr. Vol. 19 pp. 40–41; Vol. 22, p. 47). Finally, the court finds that an effective court-oriented monitoring program is necessary for effective implementation of a desegregation plan to assure that delivery of educational services will not be made in a discriminatory manner.

## F. *School Financing*

23. The Detroit School District receives operating funds by levying a property tax, a portion of which is voted by the electors of the school district and a portion of which is allocated by the Wayne County Tax Allocation Board from the 15 mills constitutionally authorized to be levied without a vote of the electorate. The school district cannot levy additional millage without a favorable vote of the electorate. The Detroit School District presently levies 22.51 mills for operating purposes and 2.25 mills to finance a prior $68 million deficit (pursuant to Public Acts 1 and 2 of 1973), a total of 24.76 mills. This tax effort produces approximately 38% of the school district's total budget. State aid comprises 47% of the total budget. The State aid formula is based upon the number of students in the school district and upon the State Equalized Valuation (SEV) of property in the district. Additional state aid is provided by special grants in the form of entitlement and competitive funds. Federal funds provide the remaining 15% of the budget. (Tr. Vol. 7, pp. 87–95; Vol. 25, pp. 106–107.)

24. The State School Aid Act contains a formula designed to equalize revenues among school districts to the extent that disparities are the result of differences in SEV per pupil among districts. Over the preceding five-year period Detroit's State Equalized Valuation (SEV) has remained relatively static while the SEV in the remainder of the state generally increased. This trend can be explained by the movement of industry, commercial institutions and people to the suburbs and the huge amounts of land used for expressways in Detroit, which remove the property from the city's tax rolls.

Because the per capita State Equalized Valuation in Detroit is 50% lower than the average for the 20 largest cities in Michigan, the school district must levy additional millage to obtain a yield equal to that of the other cities. (Tr. Vol. VII, p. 108, Defendant Board's Exhibit 31.) Because of legislation directed specifically to the Detroit School District, it is required to operate on a balanced budget and must file monthly reports with the State Auditor General. See Mich.Comp.Laws Sections 388.1238–1240.

25. The total of all municipal taxes paid by Detroit citizens translates into a municipal millage equivalent of 84.83 mills. This is the highest tax burden in the state and is 55% higher than the state average. Only 16 cities in the State of Michigan levy an income tax; among them, Detroit's rate is the highest. However, Detroit's per capita income tax yield is substantially lower than the other 15 cities. Moreover, county taxes paid by Detroit citizens are 14.4% higher than the state average, and Detroit municipal taxes are 14.6% higher than the state average.

Detroit taxpayers also have the highest municipal overburden in the state. (Defendant Board's Exhibits 30, 33 & 41.) The State offers assistance to school districts whose municipal overburden (i. e. the total property tax rate in the district excluding the amount levied for school operating purposes) exceeds 125% of the state average (Bursley Act, Mich.Comp.Laws Section 338.1125). The Act is designed to aid school districts throughout the state that are unable to raise sufficient tax revenues because their taxpayers refuse to approve higher millage requests in the face of numerous other taxes imposed on the district by other local taxing authorities. (Tr. Vol. 7, pp. 103–104.) Presently, the municipal overburden section of

the Act is only approximately 28% funded by the Michigan Legislature. If the section were fully funded, the Detroit school district would receive an additional $61,682,000; if it were 50% funded during the 1974–75 school year, the school system would have received an additional $18,787,000. (Tr. Vol. 7, pp. 116–120.) Thus, the State does not supply the Detroit school district with as much money as the Act provides.

26. The power equalizing section of the State School Aid Act guarantees that, subject to certain conditions, each school district will have available $975 per student. If local tax revenue is insufficient to generate this amount, state aid will fund the balance. Complete funding of the balance, however, is contingent upon a local school district millage levy of 25 mills for operating purposes; where a school district levies a lesser amount, state aid is reduced proportionately. While 2.25 mills of Detroit's levy goes to debt retirement rather than operating purposes, the entire 24.76 mills is counted in the formula for state aid. However, state aid does not provide operating revenue to replace the 2.25 mills used for debt retirement. Thus, the 24.76 levy produces operating revenue of only $916 per student in local taxes and state aid. (Tr. Vol. 7, pp. 93–107.)

The Wayne County Tax Allocation Board allocates .64 mills to the Detroit School District, which is passed on directly to the Detroit Library Commission. Since the majority of school districts in Wayne County receive 8.65 mills from the Tax Allocation Board and Detroit receives only 8.01 mills exclusive of the library allocation, this additional .64 mills should be counted in the State Aid calculation; however, it is not. If it were, the district would have a total levy of 25.40 mills and thus would be entitled to the maximum state aid guarantee under the power equalizing section of the Act.

The Detroit School District's millage levy of 24.76 mills is slightly below the state average of 26.15 mills. However, when this millage levy is added to all other taxes assessed against a Detroit taxpayer, the tax burden is greatly in excess of the state average. (Tr. Vol. 7, p. 104; Vol. 24, p. 147.) This burden has caused Detroit taxpayers to reject requests for additional millage. Seven of the ten millage elections over the past eight years have failed. Of the three successful votes, one approved replacing a 1% income tax that the School Board was authorized to levy pursuant to Public Acts 1 and 2 of 1973 with a 7 mill property tax; another merely renewed an already existing 7.5 mills for an additional ten years. (Defendant Board's Exhibit 40; Tr. Vol. 24, pp. 143–144, 150–151; Vol. 7, p. 140.) It can be reasonably expected that the already heavy burden upon Detroit taxpayers will cause them to reject further requests for millage increases in the near future.

27. The cost of education is a function of the size of the system and the Detroit School System, with an enrollment of 257,000 students, is the largest school district in the State of Michigan. Moreover, the fact that Detroit's ranking for per pupil expenditure is above the state average is insignificant because per pupil educational costs are greater in urban areas. Additionally, the drop-out rate in the Detroit School District has been increasing over the past ten years; the reduction in enrollment results in less State aid under the pupil membership formula of the State Aid Act at the same time that the cost of delivering educational services is increasing.

28. Prior to a 1971 legislative enactment, the Detroit School District did not receive any State reimbursement for in-city transportation expenditures, even though reimbursement was provided to rural and suburban school districts. (Tr. Vol. 24, pp. 103–105.) The Detroit School District first received an allocation for transportation in the 1973–74 school year, which was based on costs expended during 1972–73. How-

ever, unlike other districts, which were reimbursed for 75% of their transportation expenditures, Detroit was reimbursed for only 92% of the 75% permitted under the Act. Moreover, reimbursement for the Detroit School District was based upon the Wayne County average transportation costs of $47.00 per pupil, while the Detroit School District actually expended $185.00 per pupil. Consequently, Detroit was reimbursed for only $288,770.39 of the $1,857,367 expended for transportation in 1972–73, and $469,981.15 of the $2,696,133 expended for transportation in 1973–74. That Detroit's transportation costs are so high may be explained by several factors. First, transportation costs are necessarily greater in urban areas than in rural or suburban areas. Second, because Detroit received no in-city transportation reimbursement whatsoever prior to 1971, Detroit does not have its own bus system and is forced to rely on more costly chartered buses to transport elementary and junior high school students. Third, Detroit is required to subsidize bus tickets for indigent high school students, which, in the long run, is also more costly than operating a transportation system. (Tr. Vol. 24, pp. 107–123; Vol. 25, pp. 19–20.)

G. *Faculty Assignments*

29. The teacher population in the Detroit School District is 49.5% black. After having established convincingly that fixed racial ratios for pupil reassignments destroy stability, the Detroit Board desegregation plan suggests a scheme for teacher reassignments that achieves a 50–50 black-white racial mix in every school in the district. This approach is overly simplistic. It fails to take account of the qualifications of a teacher to teach the subject and grade level, the necessity of balancing schools with respect to teacher experience and the necessity of considering the sex of the teacher, all of which are necessary ingredients for quality desegregated education. To seek a fixed racial mix,

without more, is undesirable and arbitrary.

Witnesses have acknowledged that the 50–50 racial quota for every school in the district was inserted in the Board's desegregation plan for the purpose of making the district eligible for Emergency School Aid Act (ESAA) funds. However, the parties did not produce credible evidence that Federal funding was denied because of improper faculty distribution rather than because of poorly documented Board applications for such funding. Nor did the parties produce evidence of the Federal requirements for teacher assignments in a desegregated system. We note that 45 CFR 185.44(d)(3) does not require a fixed racial quota for every school:

"(3) In the case of ineligibility resulting from discriminatory assignment of teachers as prohibited by 185.43(b)(2), such applications for waiver shall contain evidence that such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color, or national origin. Such non-discriminatory assignments shall, in the case of a local educational agency implementing a plan descripted in 195.11(a), conform to the requirements of such plan with respect to assignment of faculty. In the case of local educational agencies not implementing such a plan, or implementing such a plan which contains no provision as to assignment of faculty, such assignments shall be made so that the proportion of minority group full-time classroom teachers at each school is between 75 percentum and 125 percentum of the proportion of such minority group teachers which exist on the faculty as a whole." (Pending proposal per 40 Fed.Reg., No. 61 part III, 14173, March 28, 1975.)

It is apparent from the quoted regulation that a school district that has been

found guilty of segregation of staff and that is not yet subject to a court desegregation order may apply for a waiver of disqualification by making assignments "so that the proportion of minority group full-time classroom teachers at each school is between 75 percentum and 125 percentum of the proportion of such minority group teachers which exist on the faculty as a whole." Thus, a school district with approximately 50% minority that has been found guilty of segregation of staff may qualify by demonstrating teacher assignments that conform to 37.0% to 62.0% black. However, the Detroit School System has never been found guilty of *de jure* staff segregation.

The plan submitted by the plaintiffs does not contain any proposal dealing with faculty reassignment; plaintiffs concluded their critique of the faculty reassignment provision in the Detroit Board's plan by stating that they had no desire to resolve collective bargaining disputes unless and until they interfered with constitutional rights of pupils. Notwithstanding this stated position, the only evidence produced in this record concerning teacher reassignments was presented by the plaintiffs, who made reference to Defendant Board Exhibit 6. This exhibit includes summaries of the identification of *educational personnel* by race. Educational personnel consists of more than just teaching staff; it also includes principals, department heads, counselors, library personnel, audio-visual personnel, school-community agents, etc. Thus, whatever correlations plaintiffs draw from this data is incompetent evidence of *faculty* segregation.

There is certainly insufficient evidence in this record to justify a finding that the ordinary administrative and collective bargaining processes of the parties will not satisfy the necessity of having a proper racial mix among the

teaching staff of the school district. Moreover, when this court's desegregation order is implemented the necessity of additional teacher transfers on a desegregated basis will become apparent. There is sufficient time for this court to obtain proper and adequate evidence to determine what orders will be essential to achieve a plan for complete desegregation of pupils, faculty and staff.

## IV. CONCLUSIONS OF LAW

■ A. *General Analysis of Both Plans.* The plaintiffs' and defendant Board's desegregation plans employ the same general techniques for desegregating the Detroit School System. Both plans pair and cluster schools, fracture grade structures and change feeder patterns of the affected schools. The pairings involve the exchange of one-half of the student population from one school with one-half of the student population of the other. Moreover, both plans provide for massive bussing.[6] Although employing similar methods for desegregation, the parties differ as to what constitutes desegregation, each asserting that his plan is more "feasible", "workable", "effective" and "realistic." These, of course, are proper criteria for testing an acceptable plan. *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Plaintiffs' approach to desegregation was devised by Dr. Gordon Foster, Director of the University of Miami Title IV Desegregation Center. Dr. Foster began by devising an arithmetical ratio for defining a racially identifiable school. Under his definition, any school that varies more than 15% in either direction from the system-wide racial ratio is racially identifiable. Plaintiffs' plan thus accepts as desegregated any elementary school that ranges between 57.3% and 87.3% black, any junior high school that ranges between

6. Defendant Board's plan, according to the court's count, would transport between 51,-000–56,000 students, affecting 159 schools.

The plaintiffs' plan, according to our count, would bus between 77,000–81,000 students and affect virtually every school in the system.

58% and 88% black and any high school that ranges between 51.9% and 81.9% black. The plan divides the system into five clusters. Racially identifiable black and white schools within each cluster are paired and one-half of the student body of each is transported between the schools. To accommodate school reassignments, grade structures are altered at all schools. Additionally, all feeder patterns are changed to accomplish desegregation of the junior and senior high schools. The plaintiffs' plan does not include any component other than student reassignment.

Unlike the plaintiffs' plan, which proposes to bring every school in the district within 15 percentage points of the system-wide racial mix, the goal of the Detroit Board's plan is to eliminate only the racially identifiable white schools, which are located largely in the outlying sections of the city. Approximately one-half of the district's 218 elementary schools will not be touched by the plan. The Board has determined that a school that has 75% or more of one race is racially identifiable. The Board's plan seeks to attain a 40% to 60% black enrollment in each school involved in the plan, although the presence of Spanish-speaking students, especially in Region Two, brings black enrollment below these percentages in some schools.

The Board's plan affects approximately 55% of the total student enrollment, or approximately 141,554 students (State critique, p. 7) and requires transportation for 51,000 students over relatively short distances. The plan gradually changes the racial ratios of the students in the junior and senior high schools by altering feeder patterns. The Board's plan generally respects regional boundary lines and does not affect three of the district's eight regions.

As an integral part of the pupil reassignment portion of its plan, the Board seeks to continue the operation of one magnet school in each region. The plan also creates a junior high

school consortium and co-curricular programs to achieve desegregation at this level. Moreover, the plan provides for the establishment of four city-wide vocational high schools and two additional technical high schools that will have enrollments controlled to conform to the system-wide racial ratio. Additionally, the Board's plan contains several educational components, which involve every school in the system.

■ B. *The Plaintiffs' Plan.* Our first objection to plaintiffs' plan is that it is too rigidly structured. It controls the entire educational life of a child. Not only does the plan reassign elementary children miles from their neighborhood schools, but because of new feeder patterns into junior and senior high schools many students will attend schools many miles from their home for eight to eleven years of their school life. Generally, courts have approached desegregation problems with flexibility, recognizing, as they must, that they are dealing with constitutional and equitable rights of children. Plaintiffs' plan will not permit such flexibility. It does not take account of demographic trends or population proportions, black or white. As an inevitable consequence, most schools are 75–85% black. Once implemented, it would identify the entire school district as black.

The plan's sole purpose is to achieve a racial mix within 15% of the system-wide ratio in every school in the district. We reject plaintiffs' contentions that this is the only method that will desegregate the Detroit School System, that their plan eliminates racially identifiable schools and that their plan can be implemented immediately. While plaintiffs' plan increases the percentage of blacks in formerly racially identifiable white schools, this could be accomplished as well by a more flexible plan. Nor does plaintiffs' plan eliminate all racially identifiable schools; it is clear to us that a school that is 85% black, although within plaintiffs' parameters, is a racially identifiable black

school. Further, as will be demonstrated, there are serious obstacles to immediate implementation of plaintiffs' plan.

The basic fallacy underlying plaintiffs' contentions, and the principal source of their plan's rigidity, lies in their definition of a desegregated school. While plaintiffs argue that any school within 15% of the system-wide racial mix is desegregated, the black-white population in the school system is so disparate that these parameters range from 56.4% to 86.4% black. Clearly, it is unreasonable to conclude that, without examining anything more than the system-wide racial composition, a school that is 55% black is a racially identifiable white school. Equally clearly, it is absurd to label a school that is 85% black as "desegregated" merely because it falls within 15% of the system-wide racial mix. To do so renders the concept of racial identifiability meaningless. While the Supreme Court has approved the use of mathematical ratios in formulating school desegregation plans, it has approved them only as "a starting point in the process of shaping a remedy." *Swann v. Board of Education,* 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). Moreover, the Court noted that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann v. Board of Education, supra,* at 24, 91 S.Ct. at 1280.

Further evidence of the rigidity of plaintiffs' plan is found in the fact that, even after transportation, many schools are left 80% or more black. These schools are not scattered at random throughout the system but are clustered in the predominantly black center of the city. See defendant Board's Exhibit 10. Another element of rigidity is the arbitrary selection of pairings in the plaintiffs' plan. Pairings within each cluster were made solely on the basis of the racial composition of the paired schools; in making the pairings, the plaintiffs did not consider the demography of the school district. Consequently, students are often bussed past a nearby 85–100% black school and are transported to another 85–100% black school further from their homes. To do so serves no useful purpose and merely increases travel distances. After all this effort, plaintiffs' plan still leaves the majority of schools racially identifiably black.

Finally, many pairings result in pupil assignments in excess of stated school capacity. For example, the proposed enrollment of 18 junior high schools exceeds capacity. At the senior high level, the plaintiffs' plan avoids over-capacity only by assuming a correction factor for dropouts that projects 13,865 fewer blacks in grades 10 through 12. There is no justification in this record for assuming such a dropout rate for blacks. Records are not available to reflect the race of dropouts, and moreover during the 1973–1974 school year only 9,925 ninth through twelfth grade students dropped out of the system. Plaintiffs' plan further attempts to remedy the problem of over-capacity through the use of the sixth, seventh and ninth grades as "swing grades." Students in a "swing grade" could be reassigned to any school having capacity. However, there is insufficient justification in the record to conclude that use of "swing grades" will solve the problem of over-capacity. In any event, "swing grades" create a greater burden upon the children involved and increase the amount of transportation necessary to effect plaintiffs' plan.

Our second objection to the plaintiffs' plan is that while it involves extensive bussing, it produces only negligible desegregative results. Plaintiffs' plan itself is a positive pronouncement that the disparate black-white ratio in this district precludes appreciable desegregation. After transporting 77,000 to 81,000 students, plaintiffs' plan accomplishes only an insignificant reduction in the black population of the vast majority of

Detroit schools. If the white population were predominant, plaintiffs' plan could achieve desegregation. Under the practicalities at hand, however, plaintiffs' plan is unsatisfactory because it does not distinguish between bussing black students to majority black schools and majority white schools. As a consequence, it casts a heavy and unnecessary burden upon the black students, notwithstanding the fact that the remedy to be fashioned is to bestow upon them benefits that were denied in the past. Black students are being asked to travel great distances to attend another conspicuously majority black school. The purpose of plaintiffs' plan is unexplainable to the children who are bussed many miles to a school with a racial composition not much different from the composition of their neighborhood school. Plaintiffs' plan could not find the acceptance in the black community necessary to the success of a desegregation plan. Moreover, the cost of the number of busses needed to effect plaintiffs' plan would financially cripple the Detroit School System, which has been operating on a survival budget for the past few years. Although the plaintiffs suggest that only 271 busses would be needed to implement their plan, we have concluded that 840 busses is a more appropriate estimate. Further, the plaintiffs ignore the fact that the Detroit School System does not presently possess the expertise to manage, route, maintain and store such a large fleet of busses. Although the Detroit School District has in the past bussed as many as 14,400 students to relieve overcrowding, to accommodate dangerous crossings or to transport students excessive distances, such bussing has been accomplished haphazardly through the use of chartered city transportation. Moreover, the record disclosed that the Detroit School Board has not yet formulated bus routes to accommodate a transportation plan. It is no answer that testimony was presented to the effect that certain school system personnel could devise the routes in a relatively short period of time; it is equally apparent from the record that their expertise to do so is questionable.

The establishment of such a vast transportation network would bring chaos and financial destruction to the school system, with the main result of bussing black children to majority black schools. In the final analysis, plaintiffs' plan results largely in isolating minority students in concentrated minority schools, changing only the location of the school that each student attends. Moreover, the price for this insignificant change is the severe burden of massive transportation. The Constitution does not require that such an extraordinary and costly remedy be applied where it produces only negligible desegregative results. If such an extraordinary remedy as bussing is to be employed, it should be used to bus black children to white schools, not to schools that are predominantly black. The use of such a remedy in these circumstances contains all of the seeds for resegregation, which this court has stated must be avoided at all costs.

■ C. *The Defendant Board of Education Plan.* The Detroit Board of Education, unlike the boards in other school desegregation cases, is willing to assume its constitutional duty to desegregate the Detroit School System. The President of the Board and the members of the bi-racial administrative staff have convinced the court they will willingly implement any desegregation order the court may issue.[7] Persuasive evidence of assured cooperation from the Board and General Superintendent lies in the fact that they have promptly complied with each and every order of this court. Pursuant to an order of the court, the Board timely submitted

7. The defendant Board took its first step to desegregate the school system as early as 1970 when it attempted to implement the April 7, 1970 plan. This attempt was frustrated only by acts of the Michigan Legislature.

a comprehensive desegregative plan; they did not choose to rely upon a "free choice" plan or other methods that provide part-time desegregation. In addition to many educational components and other desegregative devices, the plan includes massive bussing for permanent reassignment of students. Moreover, the attorney for the Board has persistently assured the court that the Board would willingly implement any plan the court may order. The Board has vehemently argued that since the primary responsibility for bringing forth a constitutional desegregation plan rests in the hands of a local school board [*Swann v. Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Davis v. School District of City of Pontiac, Inc.*, 443 F.2d 573, 577 (6th Cir. 1971)], other plans should not be considered for implementation by the court. We were persuaded, however, that a desegregation plan must be considered in light of all available alternatives. *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

Notwithstanding the Board's cooperative disposition, we perceive from the evidentiary hearing and from information furnished to the court both by the Community Relations Service and our own court-appointed experts that the plan adopted by the Board is a compromise taking into account many divergent views. In January 1975, before this court's order to submit a desegregation plan, the Board created the "Office of Desegregation" to prepare a desegregation plan. This Office was staffed by many people with divergent views. The vote to approve the final plan was 9 to 4, split along racial lines. Competing factions within the Board together with their followings have held widely differing views on desegregation. Throughout the remedial hearing, there was excessive speculation concerning what the court would mandate as constitutionally required for desegregation.

As a consequence, the plan as submitted was not well documented. The plan did not inform the court of the extent to which any of the programs suggested exist in the school district at the present time. Nor did the plan present alternatives to the pairings and clusters suggested. Therefore, the court deemed it necessary to commission its experts to obtain information necessary to evaluate the suggested educational components. The court further commissioned its experts to present additional alternatives to the transportation component contained in the plan in order to evaluate the constitutionality of the plan as submitted by the Board.

Having considered the alternatives in light of all the "practicalities" at hand, we conclude that the Board's goal of desegregating by eliminating racially identifiable white schools meets constitutional standards for desegregating the Detroit School System. Moreover, we approve the Board's view that the plan must include educational components allowing for further desegregation and assuring a successful desegregative effort. However, the plan taken as a whole is not free from objection. While disavowing any attempt to adhere to fixed racial ratios for each school, the Board's plan does just that. The Board sought to determine the racial mix that provides the greatest degree of meaningful interaction between the races while at the same time providing reliable assurances of stability. Having established that schools in the 40–60% range have not been changed by demographic shifts, the Board sought to impose this ratio (which is in reality 50%–50% plus or minus 10%) on all of the schools involved in its plan.

Rigid adherence to racial percentages is not only undesirable but constitutionally infirm. Racial percentages may be used as a starting point in formulating a remedy, but it is essential that all of the critical circumstances apparent in a particular school district be afforded proper weight. *Swann v. Board of Education, supra.* It would be simplistic to assume that the mere adherence to racial quotas is suf-

ficient to counter the pervasive effects of years of segregation. Because of inflexibile adherence to these percentages, some of the Board's school pairings are made without regard to the facts at hand. For example, some of the Board's school pairings include schools that are located in bi-racial residential areas and have become desegregated naturally. To bus white or black children from these schools is to employ transportation solely to accommodate a racial count. Such transportation serves no desegregative purpose and should be avoided by the Detroit Board. Where a school already satisfies the definition of a desegregated school, it should not be included in a transportation plan.

 Thus, while we accept the Board's rationale of providing desegregation by eliminating the racially identifiable white schools, we must reject the Board's plan itself because, like the plaintiffs' plan, it is too rigidly structured, seeking to obtain fixed quotas through massive bussing, and fails to take account of the "practicalities." Additionally, the Board's plan is objectionable in that it fails to consider techniques for changing the racial compositions of schools that do not involve transportation. Borderline schools are paired in the Board's plan even where re-zoning across regional lines might suffice to produce desegregation without transportation. Re-zoning is preferable to bussing because it reduces transportation, permits walk-in schools and serves bi-racial neighborhoods. Rather than pair schools and transport students, the Board should first exhaust the possibility of restructuring attendance zones. Where capacity permits, one-way bussing might also reduce the amount of transportation needed to desegregate.

The Board's plan is further objectionable in that it needlessly changes the grade structures of schools involved in the plan. It seems to us that traditional grade structures such as K–5, 6–8 and 9–12, which are preferable because irregular grade structures hamper school curriculum offerings, can be achieved.

Moreover, we are not convinced that the choice of schools involved in the pairings was not influenced by political considerations unrelated to the effect of the individual pairing on desegregation. In order to detail our concern, we must take account of the structure of the Detroit School System. The decentralized system was conceived to afford an opportunity for the community to exercise greater control over its school system; however, decentralization as practiced in Detroit has not truly accomplished this goal.

Pursuant to Act 48 of the Michigan Public Acts of 1970 (Mich.Comp.Laws 388.171 *et seq.*), the Detroit School System is divided into eight regions, each of which is permitted a vast amount of autonomy. Each region has its own board of education selected by the people within the region. The board member receiving the most votes not only is elected chairman of the regional board but also is a member of the central Board of Education. Thus, eight of the thirteen seats on the Central Board are occupied by regional chairmen. It is obvious that through political maneuvering, the eight regional chairmen can combine to promote regional interests at the expense of the over-all interests of the school system. Thus, desegregation could be hampered through the political maneuvering of the regional board members combining to promote merely regional interests. Since the regional members constitute a majority of the Board, there is no way to ensure that the interests of the entire school system can be advanced.

We are unable to perceive from the Act a legislative intent to create the structure that in fact developed in the Detroit Schools. Rather than decentralizing to disperse bureaucratic authority, the Detroit Schools have developed another completely bureaucratized political institution: the regional boards of education. As originally conceived, the

legislature envisioned "community centered schools", not separate independent bureaucracies substituting for a larger one. Moreover, the present structure of the system frustrates the achievement of educational goals common to all schools throughout the system. The system is no longer a top-to-bottom command educational organization. What has impressed this court as a competent, dedicated staff at the top lacks the means of assuring that its orders and programs will be executed at the bottom. Any programs designed to advance the interests of the entire system can be frustrated by any one of the eight separate regions. An edict from the top can be diluted so that by the time it reaches the lower level it has little or no impact.

Moreover, the testimony has indicated that the lines of demarcation between the central and regional boards have become obscured. The eight regional chairman acting in conjunction can effectively strip the Central Board of all of its power. Thus, the Central Board appears to have been relegated to the role of advise and consent, and it is apparent from the "Guidelines for Decentralization" (Defendant Board's Exhibit 4) that the Central Board must consent more frequently than it advises. Thus, Detroit' voters have been bequeathed no more than a vote for a regional board in exchange for the Central Board. Nothing further toward achieving community control has developed in five years of decentralization. The political institution that has developed has cast a heavier financial burden upon the people of Detroit without resulting in a greater voice for the community in the operation of the school system. Moreover, the structure has not been able to develop or hold public interest in the schools. Thus, the system now proposes to pay for the community relations and participation that the legislature thought would be engendered by the Act itself. The legislature may wish to take a fresh look at the structure that has developed in order to bring it more in line with the stated goals of decentralization.

It is conceivable that the regions themselves might have made demands concerning the very pairings contained in the plan; by soliciting the support of other regions, each region could effectively veto the inclusion of any given school in the plan. Evidence of such political accommodation might exist in some of the pairings chosen for the Board's plan. Some schools that fall within the Board's racial parameters are nevertheless paired to reduce their percentage of black students. For example, Hanneman School is reduced from 58% to 48% black, Cary is reduced from 58% to 44% black, McMillan is reduced from 52% to 41% black and Edison is reduced from 65% to 51% black. Transportation for the purpose of reducing the percentage of black students in already desegregated schools is clearly unnecessary and is inconsistent with the Board's avowed purpose of eliminating racially identifiable white schools. While the court cannot conclude that the inclusion of such schools in the Board's plan necessarily resulted from accommodation of regional interests for political motives, neither can the court rule out such a possibility.

The Board's plan also includes a number of educational components intended to facilitate desegregation. Some are unrelated to desegregation and have been inserted with the hope that they could be implemented by court order. Moreover, the magnitude and the importance of some components are overly exaggerated. In its entirety, the Board plan requires an expenditure of more than $60 million. However, many of the proposed components have merit. Our remedy includes many of the Board's suggested components and adds others that we feel are constitutionally mandated.

■ D. *Plaintiffs' Objections to the Board's Plan.* The plaintiffs' principle complaint is that after application of the Detroit Board's plan, the racial composition of student enrollment in Re-

gions I, V and VIII, which comprise the inner core of the city, remains virtually unchanged at 90% to 95% black. Plaintiffs complain that the racial composition of student enrollment in 87 elementary schools, 18 junior high schools and 8 high schools in those three regions remains unchanged. Considering the practicalities at hand, we do not find that this objection presents any constitutional impediment to the Board's plan. If the number of all-black or predominantly black schools that remain untouched appears to be large it must be remembered that the school district itself is large; it is the fifth largest in the country and contains a total of 326 schools spread over a 136 square mile area in which whites are outnumbered by blacks.

Plaintiffs refuse to acknowledge that the racial composition of these three regions precludes their inclusion in a desegregation plan. In Region V, for example, there are 31,354 students of whom (excluding the Spanish surnamed) only 989 (3.1%) are white. In Region VIII, there are 29,725 students of whom (excluding Spanish surnamed) only 1,329 (4.5%) are white. In Region I, there are 24,907 students of whom (excluding Spanish surnamed) only 2,049 (8.2%) are white. Clearly, it would be futile to attempt desegregation within the boundaries of these regions; thus, a desegregation plan including these three regions would have to cross regional boundaries. But to include these regions in the Board's plan would bring about the same result that pertains after application of the plaintiffs' own plan. The plaintiffs' plan itself is sufficient proof that any attempt to include these regions produces only negligible results. Application of plaintiffs' plan "would make the Detroit school system more identifiably Black, and leave many of its schools 75 to 90 per cent Black." (Findings of Fact— March 28, 1972, 484 F.2d 215, 243–44 (1973.))[8]

That inclusion of these three regions in a desegregation plan would produce only negligible desegregative results is inevitable because even excluding Regions I, V and VIII there are only 63,446 white students as compared to 103,007 black students. To attempt to disperse those white students throughout the eight regions, including the three overwhelmingly black regions, would produce such negligible desegregative benefits that the extraordinary remedy of such cross-regional bussing would be unwarranted. To do so would only serve to lessen the little community control blacks now enjoy in those regions and, therefore, injure the very class the remedy is intended to benefit. In the face of these "practicalities" there is no constitutional objection to leaving a number of one-race or predominantly one-race schools. *Swann v. Board of Education, supra; Quality Ed. for All Child., Inc. v. School Bd., etc. Ill.,* 385 F.Supp. 803, 823–24 (D.C.Ill.1974); *Davis v. Board of School Commissioners of Mobile County,* 430 F.2d 883 (5th Cir. 1970); *Mannings v. Board of Pub. Instruc. of Hillsborough Co., Fla.,* 427 F.2d 874 (5th Cir., 1970).

Plaintiffs next contend that the Board's decision to leave a number of one-race or predominantly one-race schools in the inner-city regions and the Board's persistence in achieving a "stable" racial mix are based plainly and simply upon the Detroit Board's fear of "white flight." They argue that the Board's decision to allow certain untouched schools to operate under capacity while certain other schools included in the plan are over-utilized is based upon the fear that middle class white families will flee the school district, the consideration of which is constitutionally impermissible. It is true that "white flight", like the degree of community resistance to a desegregation order, is not one of the "practicalities" to be considered in formulating a just, feasible

8. The district court's ruling on the Detroit-only desegregation plan is set out in full by the Court of Appeals, *id.,* at 242–245, and and is not otherwise officially reported.

and workable plan. The law must be obeyed notwithstanding these considerations. The Supreme Court has stated on several occasions that white flight is not justification for limiting the degree of desegregation; nor will it justify a school board's refusal to desegregate. *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *United States v. Scotland Neck Bd. of Educ.,* 407 U.S. 484, 92 S. Ct. 2214, 33 L.Ed.2d 75 (1972). Our own and other circuits have similarly ruled. *Higgins v. Board of Education of City of Grand Rapids,* 508 F.2d 779 (6th Cir. 1974); *United States v. Board of Sch. Com'rs, Indianapolis, Ind.,* 503 F.2d 68 (7th Cir. 1974). To hold otherwise would be tantamount to depriving school children of their constitutional rights in favor of those who prefer segregation. Moreover, consideration of white flight would be senseless in view of available statistical data contained in the United States Census Bureau Statistics demonstrating that the exodus from the City of Detroit occurred in the decade preceding the filing of this litigation and has subsided since that date.[9] In any event, the evidence presented does not support the conclusion that the Detroit Board was responsive to the fear of white flight in the formulation of its desegregation plan.

■ On the other hand, it is unreasonable to expect the Central Board to administer a large school system in a vacuum. It is one thing to consider white flight to avoid or limit desegregation; it is quite another thing to consider the practical problems with which a board of education is faced in attempting to achieve an acceptable racial balance without aggravating conditions that produce a self-defeating exodus of the middle class white and black. *Higgins v. Board of Education of City*

*of Grand Rapids, supra.* Detroit's citizens are faced with a tax burden greater than any other city in the State of Michigan. The effects of the community over-burden in the district, caused by the degree of taxing authority exercised by the City of Detroit, are not ameliorated to the full extent provided by law because the program is not fully funded by the State. The Board operates in a city that has left little room for taxation to operate the school system. The community at large has already indicated its lack of support for propositions designed to increase the Board's millage by rejecting such proposals at the polls eight times. Not only is it constitutionally permissible to take these "practicalities at hand" into account in forming a desegregation plan, but it would be irresponsible for this court not to consider such practicalities where the very survival of an already bankrupt school system is at stake. To act irresponsibly would deny all school children the right to quality education.

■ The Board was justified in considering the "phenomenon of resegregation" in devising its plan for desegregation. Well-intentioned middle class blacks and whites will prefer private schools and suburban schools to the prospect of remaining in a school district becoming incapable of delivering basic educational services. A white and middle class black exodus will assuredly result if, as a result of desegregation orders, the school district became chaotic and hostile to intellectual achievement. It was these "practicalities" that were considered by the Board in attempting to achieve a degree of racial stability, and we find that it is constitutionally permissible to take such practicalities into account. As we have previously said, the plaintiffs' plan itself sufficiently demonstrates the justification for allowing one-race schools to operate in Detroit.

9. In addition, it would be unwise for the court to consider white flight in view of the fact that there is an abundance of literature acknowledging that white flight is perceived more as a function of class than race or resistance to desegregative orders. See Nancy St. John, *School Desegregation, Outcomes for Children,* John Wiley & Sons, New York.

The alternative is to make each and every school in the district identifiably black.

 Finally, plaintiffs have presented much evidence establishing that black children in segregated schools suffer adverse educational and psychological damage. This is a principle that has already been acknowledged by the courts, *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and indeed this principle itself justifies the imposition of a desegregation order. However, the parties differ on the definition of desegregation. We have demonstrated the fallacy underlying plaintiffs' definition. As a result of the application of their plan, all of the schools throughout the district become racially identifiably black. Thus, psychological damage is more likely to occur as a result of plaintiffs' plan than as a result of the plan the court adopts. There are measures for assuring a perception that schools are desegregated other than the presence of white students: equal facilities, integrated faculties and meaningful guarantees that every student is welcome in any school notwithstanding race. Oftentimes, as plaintiffs' plan demonstrates, the use of fixed quotas will not give assurances of desegregation but instead may tend to extend segregation throughout the entire system. In a district where the racial percentages are as disparate as in this district, the existence of predominantly black schools is not demeaning to blacks. A plan that does no more than attempt to achieve the system-wide ratio in each and every school may result in transporting children merely to scatter a few white students here and there among the black students who are in the majority. To seek this result assumes that there is some divine grace in being white. The notion that the mere dispersing of whites here and there is educationally beneficial to black students is demeaning. An appropriate desegregation plan recognizes all the practicalities with which a particular school district is faced. A desegregation plan must be based upon constitutional and equitable rights of individual students and upon the educational goals that desegregation seeks to attain.

E. *General Conclusions Pertaining to Both Plans.* Many definitions of desegregation have been advanced by courts, educators and social scientists. Some have said that not more than 90% may be of any one race. Others hold that not more than 50% may be of any one minority group. Still others insist on fixed racial quotas that reflect ethnic proportions prevailing in a given area such as a state, county or local community. Some argue for precise ratios while others find that a specified tolerance, expressed as an arbitrary percentage that does not relate to racial compositions but rather is devised to accommodate an approach to planned desegregation, is necessary. If school desegregation does not occur naturally through bi-racial neighborhoods, it must be planned. Limitations may be imposed by the desegregated area. For example, the black proportion of the population can be so great that racial balance will inevitably result in majority black schools. In such an area, only two alternatives are available: The desegregation area must be enlarged or flexibility must be permitted in defining a desegregated setting.

While there are many differences between the plans proposed by the plaintiffs and the defendant Board, both plans share the common defect of relying on fixed racial percentages. Both plans attempt to conform the racial percentage of all of the schools included therein to a predetermined range. We have indicated that the Constitution does not require such an inflexible approach to desegregation. Both plans fail to take account of the practicalities at hand, such as demographic trends, financial limitations, existing grade structures and naturally integrated neighborhoods. Both plans rely exclusively on transportation to reassign pupils without exploring alternative tech-

niques. In the final analysis, it is because both plans are inattentive to such practicalities that both plans must be rejected. Because both plans ignore the "practicalities," both plans require massive transportation that is, at least to some degree, unnecessary to achieve desegration.

Plaintiffs contend that there is only one Constitution, equally applicable to all school districts. Thus, they argue that since we would not hesitate to apply theire parameters to a 72.5% white school district, we should equally apply them to a 72.5% black school district. We think such an argument in the context of this school district is superficial. The argument ignores the fact that the "practicalities of the situation", which the Constitution requires that we take into account, would be different if the school district were 72.5% white. There would not be, for example, irresponsible bussing of black children to black identifiable schools. Thus, we are required to bear in mind that plaintiffs represent a class of blacks, and that the bussing of black students to identifiably black schools places a burden on the blacks, the very class whom the remedy is supposed to benefit, far in excess of the benefit resulting therefrom. Moreover, because plaintiffs represent a class of blacks and not a class of whites, desegregation requires only that plaintiffs themselves be represented in significant proportions throughout the school district through the elimination of identifiably white schools. That a unitary school system in Detroit would not require the elimination of black identifiable schools as well is obvious from the plaintiffs' argument: If the system were 72.5% white, dispersing the blacks throughout the entire system would not eliminate white identifiable schools.

Moreover, that elimination of white identifiable schools is sufficient for desegregation in Detroit is apparent from consideration of the evil desegregation is designed to correct. As plaintiffs have argued throughout this litigation, the evil of segregation lies in the devastating psychological impact upon black children of the knowledge that they are being excluded from white schools. "To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Board of Education,* 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). However, when blacks are represented in all schools throughout the system, i. e., when white identifiable schools are eliminated, this psychological effect no longer exists. There no longer is a denial of their right to equal protection when there are no schools from which they are excluded.

We have concluded that the rationale behind the Board's proposed plan promises meaningful disestablishment of the state-imposed segregation. We perceive it to be our obligation to assess the effectiveness of the Board's plan in the light of the circumstances present and options available. Accordingly, the remedy we propose will set forth constitutional guidelines. *Green v. County School Board of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

From the above, it is apparent that a fresh start is required to dismantle the remaining vestiges of a dual school system. We are prepared now to furnish the Board with guidelines solely devoted to this purpose and to assure quality education for all children in the system.

## V. REMEDIAL GUIDELINES

The remedial guidelines that we detail herein define constitutional requirements for dismantling the dual school system found to exist in Detroit. In fashioning these guidelines, we have carefully considered the "practicalities of the situation" existing in this district. The guidelines are characterized by the flexibility needed to accommodate conflicting

community concerns. We have not, however, allowed flexibility to substitute for effectiveness, and it is our belief that these guidelines will achieve quality desegregated education for all children.

 Recognizing that the interest of the community as a whole is a legitimate concern of the district court in formulating a desegregation remedy, the Supreme Court has furnished the basic guideline:

> "Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S. Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

Because a desegregation plan is comparable to other equitable remedies, these guidelines are not premised upon a supposed inflexible constitutional standard that each school must have a predetermined racial composition. *Swann v. Board of Education,* 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Accordingly, there may be variances in the racial mix between regions and between schools within a region. The guidelines recognize that inflexible parameters are artificial and arbitrary and that their application to the Detroit schools would disrupt and bankrupt the entire system. Thus, rather than focus on each school in the system, the guidelines balance the practicalities that affect the system as a whole. Reflecting such practicalities, the guidelines recognize the impossibility of eliminating all racially identifiable black schools.

 Further, consistent with general equitable principles, the guidelines balance the burden imposed against the desegregative results achieved. They recognize that transporting children is an extraordinary remedy to be employed only when appreciable results may be accomplished thereby, and then only when other alternatives have been exhausted. Therefore, our guidelines do not require transporting black children to predominantly black schools. Nor do they require transporting black or white children from naturally desegregated attendance areas. The guidelines acknowledge that the goal of desegregating this school system requires the elimination of racially identifiable white schools. Therefore, the guidelines require that a representative number of black students be assigned to every school in the district. However, taking account of the wide variance in racial composition existing throughout this school district, these guidelines do not attempt to eliminate racially identifiable white schools by imposing fixed ratios. We suggest a 50–50 racial mix only as a starting point; we permit variations that take into account the desegregative results likely to be achieved.

 Further, the guidelines recognize that, in a unitary school system, each school need not reflect the system-wide racial ratio. The guidelines consider criteria for measuring a unitary system other than ratios, such as faculty assignments, staff assignments, extracurricular activities, equality of facilities and assignment patterns. Moreover, the central theme of the guidelines is that equal educational opportunities must be available for all children. An· equitable, workable and feasible plan must do more than just reassign students. Thus, the guidelines provide for educational components designed both to equalize the delivery of educational services at all schools and to restore quality education, which has deteriorated due to past acts of discrimination. Still other guidelines outline components designed to assure successful implementation of the court order by meeting head-on the special problems accompanying desegregation.

 From these guidelines a plan should evolve that creates a unitary school system in which every school in the community will be open to all stu-

dents, regardless of color. At the same time, the guidelines do not neglect those considerations that would make it difficult for the system to maintain the financial support of the community. Inherent in these guidelines is the recognition that a desegregation case requires a search for a solution that is equitable and fair to all. Only in this way can stability be assured and a sound educational system be preserved for the entire community.

## 1. Guidelines for Revision of the Board Plan—Student Transportation

The guidelines that follow will aid the Board in producing a plan that eliminates the remaining racially identifiably white schools in the district by reassigning black students, who are in the majority, to schools throughout the city. It has been emphasized, however, that these guidelines do not sanction adherence to fixed racial ratios; they permit variation based on the constitutionally required consideration of the "practicalities of the situation." *Davis v. School Commissioners of Mobile County*, 402 U. S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). The guidelines recognize that variation in racial ratios is a function of many factors and does not necessarily diminish the degree of desegregation.

 From these guidelines, a plan should evolve that effectively desegregates, brings into equitable balance the objectives sought and the results to be achieved,[10] and exhausts all alternatives before settling on the best method to achieve its results. Such guidelines follow:

(a) Where possible, desegregation should be accomplished by re-zoning attendance areas in lieu of transport-

ing children.[11] Before using transportation, the Board must establish that all re-zoning methods have been exhausted. The re-zoning should be attempted only after all the requirements of the court's order are considered. The Board is reminded that when re-zoning efforts are attempted, regional lines need not be respected; when the choice is between preserving regional lines and bussing, regional lines must give way. Re-zoning will reduce the amount of transportation required to desegregate and will permit the use of walk-in schools in integrated neighborhoods.

(b) The revised transportation plan should avoid bussing black children to predominantly black schools. A school that is 55% or more black is a predominantly black school. Neither black nor white children should be bussed to schools that are already desegregated according to these guidelines; transportation under such circumstances produces an inequitable burden upon the children affected. Where only a small change in enrollment is needed to bring a school within the 30% to 55% range, the use of satellite zones should be explored. We trust the Board is assembling the data base suggested by the court to create computer print-outs showing the racial composition of neighborhoods by grids. When these data are compiled the Board will be able to avoid transportation under the conditions described above.

 The Detroit School System now transports 14,400 students by chartered bus to relieve overcrowding or to overcome dangerous crossings and long distances. Attempts should be made to

10. In *Swann v. Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) the district courts are reminded that a desegregation case is no different than an ordinary case in equity. The court stated: "The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution."

11. Although the plaintiffs attempted to desegregate by rezoning attendance areas, it is this court's belief that their failure to do so was a result of their definition of a desegregated school. There is no evidence in the record that, given this court's more flexible approach to desegregation, rezoning attendance areas will not be a useful desegregative tool.

accommodate these children at neighborhood schools by re-zoning where the neighborhood school is an equal facility. However, if such transportation is necessary to desegregate the receiving school, it should continue. In the event that it is essential to bus these students they should be transported to aid desegregation only in accordance with these guidelines.

(c) Elementary schools should not be paired when one or both of the schools already satisfies the court's definition of a desegregated school.[12] Where desegregation cannot be accomplished by re-zoning or the use of satellite schools, the Board may pair appropriate schools. In making the pairings the Board should, wherever possible, pair an identifiably white school with the nearest school exceeding 55% black enrollment. In this way, the distances involved in transportation will be kept to a minimum.

(d) The Board should seek to maintain uniform grade structures, consisting of K–5, 6–8 and 9–12. Since an excessive variety of grade structures makes it difficult to provide school offerings consistent with quality education, consistent grade structures are preferable. Irregular grade structures would make it difficult to incorporate the components contained in the court's order and would make the plan more difficult to monitor.

(e) *Desegregation and Integration Guide Translated Into Percentages and Racial Ratios.* This guideline is derived from assessing the practicalities confronting the Detroit School System, such as a rapidly increasing black student population and meager financial resources.[13] Schools with a resident population in the service area of between 30% and 55% black shall be considered desegregated. If a school is within this range, no change in pupil assignment is necessary. Further pupils need not be reassigned merely because a school's racial composition exceeds 55% black; the "practicalities" may dictate leaving the school alone. However, in no event should a school remain more than 70% white.

(f) *Elementary Schools.* Consistent with the foregoing, elementary schools should be desegregated by re-zoning if possible. An elementary school with a resident population in the service area of between 30–50% black has achieved a permissible degree of desegregation. In those schools where a small change in enrollment will bring the school within these parameters, attempts should be made to do so by using a satellite zone. In selecting satellite zones, an appropriate group of children to select would be a group residing in an elementary service area that includes a middle school to which the children can walk. Transporting a child for his elementary school career would be more equitable if the child could later walk to a middle school. Although it may be impossible to divide the burden involved in a desegregation plan equally, the Board must avoid gross inequities. Particularly, there should not be great variations in the transportation burden falling on adjacent areas because such variations will influence residential patterns. The

12. For example, in the Southwest Constellation, the Carrie School is paired although it is already 58% black. In the Chadsey Constellation, the Hanneman School is 58% black. Moreover, the Board plan sometimes precludes students within walking distance of a school from going to that school. For example, the Burt Elementary attendance zone is in the Redford area, yet Burt students have been assigned to Cooley rather than Redford. Similarly, students in the Schultz attendance zone should go to Mumford, yet they are assigned to Redford.

13. Another factor that the Board may wish to consider in making its pairings is the "Weighted Poverty Index" of each school, which varies in Detroit from 0.18 to well over 40. The socio-economic mix, as measured by the poverty index, is a significant factor and should be considered along with the racial mix. As far as possible, the Board should strive to have no school with a poverty index greater than 15.

Board should further avoid bussing children out of an integrated service area.

Since K–5 grade structures will result in excessive school capacity, the Board can take antiquated school buildings out of service. These closings and subsequent pupil reassignments are intended to equalize facilities and to further desegregation both by adjusting racial composition and by facilitating a non-discriminatory construction program. The Board may also consider closing some schools temporarily if further desegregation would result.

Elementary schools that cannot be desegregated by re-zoning or by satellite zones shall be paired. If possible, the grade structure at each paired school shall remain K–5 provided the paired schools have approximately equal enrollments. Pairings need not be made one on one; for example, a 900-pupil school can be paired with a 300 and 600-pupil school. If maintaining the grade structure K–5 is not possible, the changing of grade structures will be permitted. Enrollments in schools can be adjusted by redrawing the service area zone lines.

The paired schools will be desegregated by exchanging pupils between the pairs. One-half of the pupils in each grade from each school will be bussed to the school or schools in the pair. The classes will be rotated annually or semiannually so that each child will attend his neighborhood school at least every other year. Teachers also may be rotated so they can continue to teach the same group of students. When the pairings are completed, students should enter integrated classrooms.

(g) *Middle Schools.* Middle schools will serve Grades 6–8. To provide for the maximum degree of desegregation, there will be two types of middle schools: "zoned middle schools" and "open enrollment middle schools." The open enrollment schools will function similarly to current magnet middle schools, but will have a controlled racial mix generally 55–70% black. The ra-

cial composition may exceed these parameters where practicalities require, but in no event should a school exceed 50% white. The zoned middle schools need not have zones that correspond to elementary service boundaries. In developing the zones, the Board shall provide walk-in schools wherever possible. Although a zoned middle school that is 30–55% black shall be considered desegregated, the Board's target should be 50% black enrollment at this level. In developing zones for middle schools, the Board may consider satellite zones but such zones should be avoided where it can be shown that they would create housing instability resulting from differing treatment of adjacent neighborhoods.

Generally, no child should be bussed for more than five of his first eight years. Any child that is bussed for desegregation at the elementary level for five years should not be bussed for desegregation to a middle school. If the Board finds compliance with this guideline impossible, the Board shall report the exceptions by numbers, race and location.

(h) *Summary.* We believe these guidelines provide sufficient latitude to accommodate the practicalities needed to be considered to preserve a financially crippled school system. The suggested parameters permit the Board to consider inevitable demographic trends and allow the formation of long-range plans to deliver quality education and maintain financial independence. (See chart following—Demographic Projections 1975–1980.) This kind of stability, which assures the durability and longevity of court orders requiring desegregation now and hereafter, is constitutionally compatible with the desegregative goals the Board must seek.

Moreover, these parameters recognize an equitable constitutional balancing of private and public needs. Students, particularly older students, must be able to perceive that the inconvenience of attending a less accessible

school serves a noble goal, that a desegregation plan will enhance the quality of education and that desegregation is neither disruptive nor destructive.

In sum, the plan will have the following characteristics:

(a) Schools as presently constituted, either by resident enrollment, bussing to relieve overcrowding or bussing resulting from school closings, that result in a 30%–55% black enrollment shall be considered desegregated.

DEMOGRAPHIC PROJECTIONS

1975–1980

% Black Enrollment

*Projected

(b) In providing further desegregation, a 50–50 enrollment may be used as a starting point for reassigning students, but no school shall be less than 30% black.

(c) Pairing shall involve only schools with enrollments under 30% or over 55% black. To minimize travel distances, pairings shall be made between each white school and the nearest predominantly black school.

(d) As far as possible, the schools will maintain a uniform grade structure of K–5, 6–8 and 9–12.

(e) Elementary schools will enroll children in grades K–5. Classrooms or half classrooms will be exchanged between the paired schools on a rotating basis, permitting each child to attend his home school at least every other year. Not all elementary school children will attend paired schools; some will reside in integrated neighborhoods and as many elementary schools as possible will be desegregated by redesigning attendance zones. Where possible, satellite zones rather than two-way bussing will be used. Where bussing is needed, bus trips will be as short as possible. The change in grade structure from K–6 to K–5 will generate excess elementary school facilities, enabling a number of antiquated schools to be taken out of service.

(f) Middle schools, 6–8, will be of two types: "open enrollment" and "zoned schools." In keeping with these guidelines, open enrollment schools will have racially controlled enrollments. Where the practicalities permit, middle schools will be 55–70% black, and no middle school will enroll less than 50% black.

(g) The plan will involve the creation of vocational centers.[14] Two high schools may be converted into vocational centers; students currently enrolled in these schools will be reassigned to other nearby schools, thus aiding desegregation. Although the vocational centers will be open to all students city-wide, their racial compositions will be controlled. Initially, no high school or vocational center shall enroll less than 40% minority. Thereafter, enrollments will be controlled to conform to these guidelines. Curriculum studies will be necessary to adjust the present city-wide schools such as the Aero Mechanics High School.

## 2. Reading and Communication Skills

The development of proficient reading skills is the most essential educational service a school system can deliver. Where a school lacks a successful reading program, a child cannot be assured academic success or a beneficial school experience. Students who have not achieved adequate reading and communication skills cannot succeed in the main-stream of society. They are limited in their vocational selection; their handicap necessarily precludes them from entering the professional world. While in school, they cannot be fairly tested.

There is no educational component more directly associated with the process of desegregation than reading. Statistical data establish that minority youngsters lag significantly behind their white counterparts in reading skills, which in turn affects the ability of minority students to follow written instructions, succeed on aptitude tests, pass entrance examinations for colleges and universities and compete in the world of arts, sciences, occupations and skills. Moreover, when such conditions persist, there is a direct effect upon the school environment. Students become disciplinary problems when in reality their problem is directly associated with an inability to conceptualize due to a lack of proper reading and communication skills. As a consequence, teachers and staff assume that such minority students are uneducable, thus further deteriorating the school environment for these students. To eradicate the effects of past discrimination, a remedial reading pro-

14. See section on Vocational Education, *infra.*

gram should be instituted immediately to correct the deficiencies of those midway in their educational experience.

The court considers this component deserving of top priority in a school district undergoing desegregation. Accordingly, the court's order will direct that the development of such a program in the desegregative process be the direct responsibility of the General Superintendent and a committee to be selected by him.[15] We trust that such a committee will include some of the expertise available in the Michigan community. Detroit is fortunate in having a number of people expert in developing learning techniques for reading who are at the same time devoted to Detroit's educational system. This court hopes that the General Superintendent will personally pioneer this effort to achieve excellence unequaled by any other school system.

### 3. In-Service Training

A comprehensive in-service training program is essential to a system undergoing desegregation. A conversion to a unitary system cannot be successful absent an in-service training program for all teachers and staff. All participants in the desegregation process must be prepared to deal with new experiences that inevitably arise. The order that follows pursuant to these guidelines requires in-service training in such fields as teacher expectations, human relations, minority culture, testing, the student code of conduct and the administration of discipline in a desegregated system for all school personnel. The program shall also include an explanation of the purpose and nature of each component in the desegregation order. It is known that teachers' attitudes toward students are affected by desegregation. These attitudes play a critical part in the atmosphere of a school and affect the pulse of the school system. Teachers, both white

and black, often have unhealthy expectations of the ability and worth of students of the oposite race. Moreover, it is known that teachers' expectations vary with socio-economic variations among students. These expectations must, through training, be re-oriented to ensure that academic achievement of black students in the desegregation process is not impeded. A comprehensive in-service training program will ensure that all students are treated equally in the educational process. The goal of a sound in-service training program should be the awareness that there are neither black students nor white students, just students.

The Detroit Board of Education is advised that Wayne State University and other universities have offered their cooperation in this desegregation effort. Accordingly, the Board shall request the Wayne State University College of Education to assist in developing a comprehensive program to provide in-service training. The court is of the view that the program outlined in the Board plan will fulfill the expectations of the court order. The Detroit Board is further directed to seek assistance and funding from the Title IV Center at the University of Michigan and, upon issuance of the court order, to submit further proposals for assistance to the United States Office Of Education for Emergency School Aid Act (ESAA) funds. Moreover, the defendant Superintendent of Public Instruction is directed to seek financial and personnel assistance from other state institutions. The in-service training program as instituted should be on-going, include all schools in the system and be open to all personnel employed by the Detroit Board of Education. Such in-service training sessions shall be conducted during the school year and just prior to the opening of school. The Board should dis-

---

15. We direct the General Superintendent's attention to the Public Report of the Education Task Force, as revised March 5, 1975.

The recommendations with respect to development of a reading program and suggestions contained therein are endorsed herein.

continue payment to teachers for attendance at such sessions on Saturdays.

### 4. *Vocational Education — Technical High Schools*

Open association with other students of varying races, cultures and religions forms the most basic ingredient in a student's learning experience. Children living, learning and playing together convert a building into a human institution with a pulse and personality. Students, parents and teachers come together to live, learn and work in an atmosphere imbued with human warmth. In this atmosphere, the attachments born of a classroom become the most durable. A segregated system deprives students of this interpersonal learning experience and injures them in a lasting way. The resulting isolation destroys the atmosphere and pulse of a school system and, eventually, the quality of the educational services rendered. Minority students in segregated settings often lose interest in education, eventually believing they have no stake in the system. This inevitable result is reflected both in the school system's dropout rate and in the number of students who graduate without being able to read or spell. Thus, a segregated school system fails to provide relevant and diversified programs to meet the needs of the students it serves.

 Vocational education is given high priority in these guidelines because while it is able to compensate for past discrimination, at the same time it serves as an effective tool for desegregation. It can both offer an immediate desegregated setting and help re-establish quality education. Vocational education is easily assimilated into the Magnet Program now in effect in this system and offers attractions that exceed those currently available. It can serve to combat the dropout rate and prepare students for specific work situations in the business world. Finally, it will equip minority students with the knowledge and skills essential to enter occupational trades often foreclosed to them.

Accordingly, the court's order will require that the defendants Detroit Board and State Board of Education create vocational centers devoted to in-depth occupational preparation in the construction trades, transportation and health services. In addition, the order will require that the defendants Detroit Board and State Board of Education create two new technical high schools in which business education will be the central part of the curriculum. It shall be the responsibility of the School Board and the State Board of Education to fulfill their obligations under the Constitution and state law to ascertain that the four vocational centers created are of the highest quality. Moreover, each of these vocational centers shall include a grade 13 providing advanced offerings both for those students presently enrolled and for other students who have left the system within the past three years.

 As an immediate desegregative effort, the Detroit Board of Education and the State Board of Education are directed to create two such vocational centers as promptly as circumstances permit. In order to eliminate the need for new construction, two existing facilities may be selected; the court's experts suggested that Cooley and Kettering be utilized as vocational centers. Accordingly, the Detroit Board shall immediately submit a plan conforming to the following guidelines:

(a) The plan shall indicate where students presently assigned to Cooley and Kettering will be reassigned and the effect of such reassignment upon desegregation. The plan should minimize the inconvenience to students who would otherwise enroll at these schools. The Board may wish to consider the feasibility of not enrolling students at either Cooley or Kettering in the September, 1975 school term.

(b) The Board shall submit maps depicting the new high school zones that result from the elimination of the Cooley and Kettering attendance areas.

(c) The plan shall contain detailed curricula for Cooley and Kettering High Schools.

(d) The vocational centers at Cooley and Kettering shall be city-wide schools and shall have a racial mix that, considering the practicalities at hand, approaches a ratio of 60% black and 40% white.

(e) The Detroit Board and the State Board should confer immediately and submit a plan to the court not later than three weeks from the issuance of the court's order. The plan should include a time and cost schedule for modifications necessary to convert Cooley and Kettering High Schools into vocational centers and should also include proposals for two additional centers. The parties are directed to ensure that these vocational centers are equal in quality to the best vocational schools in the country.

As an immediate desegregative effort the Detroit Board shall, as promptly as circumstances permit, undertake to create two additional technical high schools, which are to be modeled after the program at Cass Technical High School. The Board shall select sites for such technical high schools that afford the maximum degree of desegregation. In keeping with this desegregative effort, the Detroit Board of Education and the General Superintendent shall commission a study of the curricula to be established at the two technical high schools. The study should determine what duplications might exist between offerings at the technical high schools and the vocational centers or the academic high schools.[16] After formulation of the joint plan for creation of the vocational centers, the State Board of Education shall submit such plan for review and evaluation to an appropriate evaluation panel such as a

vocational education expert at an institution of higher learning. When the joint plan is submitted, it shall include the evaluation made by such expert and modifications suggested as a result of such evaluation.

Upon recommendation of the court-appointed experts, the order of the court will direct, as a further desegregative effort, that the Detroit Board of Education undertake a study evaluating an alternate form of education following the Parkway Concept. The court's experts have suggested that Northern High School could be used for such a project. Accordingly, the defendant School Board is directed to submit plans for such a program, including an evaluation of its feasibility and the contribution that such a program might make to desegregation. The Board shall further seek and obtain a professional evaluation of such concept from outside the School Board's present administrative staff. If the evaluation is favorable, the Board shall thereafter submit plans and costs schedules for implementation of such concept.

It has been brought to the attention of the court that the Detroit School Board is presently ineligible for full funding from the state to operate the proposed vocational education programs because certain provisions of the contract between the Detroit School Board and the Detroit Federation of Teachers, which require that a school day not exceed $7\frac{1}{4}$ hours and impose a maximum of 25 teaching periods per week, conflict with regulations promulgated by the State Board of Education. The court, however, has stated that vocational education programs must be instituted pursuant to a desegregation mandate. Accordingly, the parties shall appear in court for a hearing and subsequent order that will set aside either the State

---

16. The Board's plan as submitted does not distinguish clearly between courses to be offered at the vocational centers and the technical high schools. The study should identify the offering of courses duplicating those at other high schools; duplication might detract from the magnet programs instituted at the two new technical high schools. The study should further determine the effect of duplication of courses at different locations upon desegregation and the quality of education.

Board of Education regulations or the contractual provisions. The date for the hearing shall be set upon motion to be filed by the Detroit Board of Education.

5. *Testing*

Of great importance to a system undergoing desegregation is the assurance that tests administered to students are free from racial, ethnic and cultural bias. Black children are especially affected by biased testing procedures. As a result of such procedures, they may find themselves segregated in classrooms for slow learners, which will thereafter impede their educational growth. Moreover, the discriminatory use of test results can cause resegregation.

 The Detroit Board and State Board of Education are constitutionally mandated to eliminate all vestiges of discrimination, including discrimination through improper testing. Thus, the Detroit Board and the State Board of Education must devise a program that will ensure that testing design, content and procedures are adaptable to a desegregated school system. The plan should include provisions dealing with staffing and costs involved. We have examined the Board's testing component carefully and have found it to be sufficiently comprehensive to serve as a model for such a testing program.

6. *Student Rights and Responsibilities*

By previous orders this court has demonstrated the high priority that it places on student rights and responsibilities, which the court has referred to as a Uniform Code of Conduct. We have also said that children living, learning and playing together convert a building into a human institution with a pulse and personality, and that when students, parents and teachers come together to live, learn and work the school develops an identifiable environment. It is this environment that the Detroit Board is constitutionally bound to protect in order to assure that every student can enjoy

the right to a happy, healthy and rewarding school experience.[17] Moreover, we agree with the plaintiffs' assertion that "[n]o violence whether against person or property, will be allowed to impede the implementation of the desegregation process. Both students and teachers must feel secure in their person and in their ability to perform their respective functions without fear of undue and unnecessary disruption."

 It is the court's intention that from the commencement of the 1975–1976 school year the Board must not tolerate violence in any school in the system. Moreover, the court order will require that the Uniform Code of Conduct be administered uniformly without regard to regional lines. All regions will be obliged to follow prescribed forms and uniform procedures, to be devised by the Central Board and approved by the court. The court will not, of course, attempt to substitute its judgment for the discretion of school administrative personnel in dealing with student violations of the Code. The court will ensure, however, that all Detroit students are afforded minimal right of due process consistent with *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). While the court is concerned that violence and vandalism do not impede the desegregative process, the court is equally concerned that the rights of the students are fully protected. In a system undergoing desegregation, black and white students will be subjected to teachers of both races who may apply the Code in a discriminatory manner. Staff members must be made aware of the rights of due process set forth in the Code. Moreover, students must be advised not only of the conduct proscribed, but also of their right to due process when involved in disciplinary procedures. The Code therefore, must simultaneously protect the students against arbitrary and discriminatory exclusions, suspensions or expulsions and assure that disruptions in the school or classroom will be dealt

17. See this court's order of July 3, 1975.

with in every instance. The court has recently received the Board's second draft of the proposed Code. Since the court has not had an opportunity to study this draft, the Board will await further directions from the court.

### 7. School-Community Relations (Parental Involvement)

The importance that the court places on this component is evident from the July 18, 1975 communication requiring the Detroit Board to submit a detailed plan for a community relations program, which the court has not yet had an opportunity to examine in detail. We agree with plaintiffs that an acceptable community relations plan should include provisions for school-community liaison and parental involvement. The school-community relations program should give real meaning to the decentralization anticipated by the Michigan Legislature and provide an effective vehicle for true community involvement in all the schools. To achieve maximum community participation the program should depend upon parental support; participants should be selected voluntarily and serve without compensation. An effective community relations program must develop a partnership between the community and the schools and must cooperate with traditional groups such as parent-teacher organizations and local school advisory boards. There should be a cooperative flow of information from the school to the community and from the community to the school. Open and free discussion and participation in the desegregation process should be encouraged. The school-community relations organization should receive complete encouragement, budgetary support, direct assistance and a free flow of information from school authorities.

The school-community relations component shall be a subject of a separate order of this court. The portion of the Board's plan that includes a monitoring provision in the suggested community-relations component is rejected.

### 8. Counseling and Career Guidance

School districts undergoing desegregation inevitably place psychological pressures upon the students affected. Counselors are essential to provide solutions to the many problems that result from such pressures. Moreover, the success of the vocational and technical schools created herein depends upon the efforts of counselors whose guidance is essential to students seeking a career. Counselors can accomplish much to shape and guide the academic experiences of students. They assist student self-development and further can acquaint students with the vocational training possibilities available in the system. It will be essential that the counselors become fully acquainted with the vocational and technical offerings created herein. Accordingly, the order issued pursuant to these guidelines will require that the Detroit Board provide guidance and counseling services, including career counseling to the junior and senior high students in the Detroit system.[18] The Board is hereby directed to submit a career guidance and counseling plan.

### 9. Co-curricular Activities

Co-curricular activities are essential supportive programs in a system undergoing desegregation. Co-curricular activities further desegregation by providing student-to-student contact and interplay in a desegregated environment. The co-curricular program should include a provision for a limited junior high school consortium, which also encourages the sharing of educational experiences among students of both races. In addition to aiding desegregation, the co-curricular program can acquaint students

---

18. It is not for the court to determine how this program ought to be staffed. We note, however, that we are unaware of any school system that has deemed it beneficial to assign full-time counselors at the elementary school level. Some school systems have found that classroom teachers who are afforded appropriate in-service training make the best counselors at the elementary level.

with the many fine institutions available in the Detroit area, which have indicated their interest in aiding the court in providing quality education to Detroit school children. The junior high school consortium will enable students to share experiences while acquiring knowledge of such institutions as the Art Institute, the Detroit Public Library, the Merrill-Palmer Institute, Wayne State University and Shaw College. The court has reviewed the provision for co-curricular activities in the Board's plan and has concluded that it contains imaginative programs. The court's order will, therefore, require that the Detroit Board develop for the court's approval a specific plan for co-curricular activities including an analysis of the costs involved.

### 10. Bilingual/Multi-Ethnic Studies

Multi-ethnic studies are essential elements of the curriculum of any outstanding school system; desegregation serves only to emphasize the need for inclusion of these studies. Moreover, by state law school districts are required to provide adequate programs for bilingual and bi-cultural instruction. See Mich.Comp.Laws sections 340.360, 390, 391. The court order will further provide for these programs.

Currently, these programs are funded by Titles III and VII of ESAA. The Board is directed to re-apply for such funds to continue its program and in such application shall include provisions for in-service training for teachers involved in such programs. The Detroit Board is further directed to seek the cooperation of Wayne State University's Ethnic Learning Resource Center in developing a resource program for comprehensive multi-ethnic instruction.

The Board shall submit finalized programs for each of these studies to the court including provisions for in-service training of the teachers involved.[19]

### 11. Faculty Assignments

The Detroit Board's plan contains a component dealing with reassignment of faculty, providing for a 50% ratio in every school. It has been noted that the teacher population in Detroit is now 49.5% black and hence nearly evenly bi-racial. However, no evidence was presented at this remedial hearing dealing with faculty segregation. Thus, it would be inappropriate for this court to order any reassignment of faculty at this time.

However, notwithstanding the prior holding of this court, affirmed on appeal, that the Detroit Board had not committed de jure acts of segregation of faculty, certain reassignments will be necessary to implement the desegregation order. Reassignments of faculty will be necessitated by the reassignments of students. Such faculty reassignments are incidental to the desegregation plan and shall be made with the purpose of further integrating the faculty. The Detroit Board and the Detroit Federation of Teachers shall immediately begin negotiations concerning reassignments necessitated by other components of this plan. Of course, in conducting these negotiations, both parties will no doubt be mindful of the federal requirement for racial composition of faculty and staff in a school system undergoing desegregation contained in USCFR 185.44(d)(3), supra.

Thereafter, both parties shall submit a report listing every school, student enrollment by race, the projected student enrollment by race following application of the plan, the present number of teachers in each school by race and the projected number of teachers by race following application of the court's order. These reports shall be submitted to the court prior to an evidentiary hearing to be set by the court.

19. While we endorse the inclusion of these programs in a desegregation plan, we draw no conclusions with respect to the budget submitted by the Board in its plan, which appears to us to be excessive. Even assuming 163 bilingual teachers are needed, there should be a corresponding reduction in the number of regular classroom teachers.

## 12. *Monitoring*

The court's order will provide for a court-created monitoring system to audit efforts made to implement the court's desegregation orders. The monitoring system created by the court shall provide for broad citizen participation. The monitoring group shall reflect the city's racial and ethnic composition so that the court can receive input from a broad spectrum of the city's population.

 Because it is the court's consti- tutional obligation to audit efforts to implement its orders, the monitoring commission shall report directly to the court. The parties may, for the court's consideration, nominate citizens for ap- pointment to the monitoring commis- sion. The court is of the view, however, that the state, to whom the Fourteenth Amendment is addressed, has an equal obligation to oversee the efforts put forth and results achieved through implemen- tation of the desegregation order. Ac- cordingly, the court will order the State Superintendent of Public Instruction to seek the assistance of available state in- stitutions to provide the supervisory and expert support staff needed to an- alyze and report the information thus obtained. The State Superintendent of Public Instruction shall suggest to the court a plan that includes the assistance of state-supported institutions such as the Title IV center of the University of Michigan.

In the court's view the monitoring of its orders is an essential part of a deseg- gation effort. The court recognizes that an effective monitoring procedure will require careful evaluation of the input from citizens' groups appointed. These groups shall be requested to develop meaningful criteria for evaluation and to suggest and recommend methods for de- veloping a uniform basis of reporting. It shall be the obligation of the State Superintendent and the institutions se- lected by him to collect and analyze all such data submitted and to provide suf-

ficient staff to supervise the work of the monitoring committee.

## VI. CONCLUSION

 In developing these guidelines, this court has not intended to usurp the School Board's administrative author- ity. Neither has this court intended to substitute its authority for the author- ity of elected state and local officials to decide which educational components are beneficial to the school community. We are especially reluctant to do so in view of the fact that the school of- ficials are willing to desegregate the school system. Their plan evidences their desire to cooperate in the desegre- gative effort. Pursuant to an order of this court, they submitted a comprehen- sive desegregation plan that did not at- tempt to rely solely upon their Magnet School Program for voluntary desegre- gation but instead included the forced transportation of a large number of students. Thus, we have taken into account that the "good faith conduct on the part of any litigant in any court, especially a court of equity and, more particularly, in the sensitive area of desegregation, is a vital element for appropriate consideration." *Montgom- ery County Board of Education v. Carr,* 400 F.2d 1, 2 (5th Cir. 1968).

 Moreover, even after a finding of segregation has been made, it is the affirmative duty of the local school board to repair the effects of segregation by constructing a unitary system. But, at the same time, once the state has been found to have discrimi- nated against a class of plaintiffs, it is the constitutional obligation of the court to assure that the denial of equal edu- cational opportunity through segrega- tion is fairly and justly remedied. Thus, the Board must remember that once it begins to desegregate, "the courts have a solemn obligation to determine whether the structure designed by the school board will house a unitary system. This obligation is unremitting . . .

Accordingly, any imprimatur of judicial approval must be entered with the caveat that until construction of a unitary system is completed, change orders, when appropriate, will be issued to ensure that the designed structure in fact accommodates a unitary system and not a bifurcated one." *Carr v. Montgomery County Board of Education*, 429 F.2d 382, 386 (5th Cir. 1970). It is in this context that the court issues these guidelines. It is for the court to declare *constitutional* standards applicable in a particular school district. The Board is free to do more than these announced standards require, so long as it demonstrates that its additional effort will have a salutary effect upon desegregation; it is the role of the court to ensure that it does not do less than what we have detailed here.

A successful desegregative effort will require cooperation and support from the entire community. Because Detroiters have always volunteered community support to advance worthwhile causes and because Detroiters know that the vitality of their city depends upon the excellence and stability of their school system, this court has already received expressions of support from the community. Many of Michigan's institutions of higher education, business corporations, labor unions and other organizations, public and private, have pledged their support and assistance to assure the successful development of quality education in the newly desegregated Detroit School System.

For example, Wayne State University, in cooperation with other institutions, can undertake prime responsibility in developing and conducting the in-service training program, which has received a high priority from this court.[20] Wayne County Community College has volunteered to consult with the Board and to assist it in the development and evaluation of the Board's proposed multi-ethnic component. It will further help with an orientation program for academic and guidance counselors. Additionally, labor and industry have demonstrated an active interest. in the quality of education in the Detroit Schools. Both sectors of the community have assured the court of their willingness to cooperate and assist in this effort. Labor and industry can be of invaluable assistance by bringing their expertise to the vocational and technical high schools created herein. They can generate jobs for young people and possibly provide equipment needed by the school district. They can also provide opportunities for on-the-job training. It is hoped that the Board will succeed in matching colleges, universities, labor and industry with selected schools or programs to further enhance the attractions available in the school system. The Board, with the aid of the court's experts, should enter into specific agreements with these organizations in order to spell out precisely the roles they will play in assisting the Detroit schools. These institutions will not, of course, be solicited for financial contributions, nor do they intend to interfere with the administrative authority of the Detroit Board. These institutions want to be of assistance to Detroit school children; they have no desire to participate in the administration of the school system. Thus, our guidelines provide the seeds to generate community support.

The guidelines also continue the magnet system to which the school community has devoted so much time and funds. We have sought to strengthen those programs now in existence and have also provided for the creation of additional schools and added attractions, including the anticipated matching of

---

20. We are informed at this writing that the Governor of the State of Michigan is aware of Detroit's need for this component. We have reason to believe that, consistent with his abiding interest in Michigan's educational system, he will approve necessary budgetary provisions to enable Wayne State University to participate.

schools with colleges, universities, business organizations and labor unions. As strengthened, these magnet programs will provide an opportunity for the occurrence of voluntary desegregation. Magnet programs, as a desegregation tool, have been approved by the Federal Education Acts of 1974, P.L. 93–380, § 214(f), 20 U.S.C. § 1713(f), and as strengthened by the court's guidelines will be sufficiently attractive to serve the dual purpose of providing quality education and voluntary desegregation. However, it must be remembered that the primary goal of these magnet schools is to operate as desegregated schools taking account of the practicalities we have deemed constitutionally permissible to consider.

Although these magnet schools play an important role in the court's guidelines, this court recognizes that total desegregation cannot come about through magnet programs alone. Since 1972, the magnet program alone has proven inadequate to desegregate the Detroit Schools. However, while some transportation may be essential, we believe that the guidelines proposed have substantially reduced the number of students transported from the number involved in either the plaintiffs' or the Board's plan.

The cooperative effort of the entire community will assure a school system capable of fulfilling community aspirations. Such community support will provide the Detroit schools with an opportunity to make a fresh start. Those once deprived of equal opportunity by past discrimination will be assured that their schools are unequaled elsewhere; they will be assured that the injury from segregation, sometimes intangible, will be eradicated. With the support of the community, the court's order will create a unitary school system and assure that past discriminatory practices will neither inflict further injury nor occur again. A school system must evolve that is concerned not with black children or white children, but just children.